(No. 22899.—

JAMES PARKS, Appellant, *vs.* THE LIBBY-OWENS-FORD GLASS COMPANY, Appellee.

*Opinion filed April 17, 1935.*

SOL ANDREWS, for appellant.

ASHCRAFT & ASHCRAFT, DUNCAN & O'CONOR, and ANGERSTEIN, PIGGOTT & ANGERSTEIN, (RUSSELL F. LOCKE, CARROLL J. LORD, ALAN E. ASHCRAFT, JR., ANDREW J. O'CONOR, and THOMAS C. ANGERSTEIN, of counsel,) for appellee.

Mr. JUSTICE FARTHING delivered the opinion of the court:

James Parks (hereinafter called the plaintiff) filed a complaint in the superior court of Cook county against the Libby-Owens-Ford Glass Company (hereinafter called the defendant) to recover damages for permanent injury to his health by alleged willful violations of section 1 of the Occupational Diseases act and sections 12 and 13 of the Health, Safety and Comfort act. The defendant moved to dismiss the complaint and later filed two amendments to its written motion. The motion to dismiss, as amended, was sustained on each of the points specified. The plaintiff elected to abide by his pleading, an order was entered that he take nothing by his suit, and judgment for costs was rendered against him and in favor of the defendant. From that judgment the plaintiff prosecutes this appeal.

For many years prior to January 1, 1934, the defendant was manufacturing glass in the city of Ottawa. In operating its factory such work was done as cleaning, sweeping and scraping floors. Vacuum lifters were used around the lay-gäng and mixing tables and buckets carried materials to the mixers. Hot air was blown on the tables where the glass was made. During these operations sand dust, glass dust and other dusts floated in the air to such an extent as to be deleterious to the health of the employees. For several years prior to January 1, 1934, the plaintiff had worked in several departments of the factory and had been exposed to the inhalation of the dusts mentioned. By his complaint he charged that the defendant had violated section 1 of the Occupational Diseases act by

its willful failure to provide proper suction fans, masks, respirators or other devices to effectively prevent him from inhaling the dusts; section 12 of the Health, Safety and Comfort act by its negligent failure to remove as far as practicable, by either ventilating or exhaust devices, the injurious dusts from the premises where he worked, and section 13 of this latter act by negligently causing and permitting the premises to be swept so as to raise these dusts, and that as a result of such violations he contracted pneumoconiosis and became totally disabled.

In support of its motion and the judgment defendant contends: (1) That the trial court was without jurisdiction to hear and determine the cause because the occupation in which the plaintiff was engaged was not within the provisions of section 1 of the Occupational Diseases act; (2) that section 1 of this act and sections 12 and 13 of the Health, Safety and Comfort act violate the due process provisions of the Federal and State constitutions; and (3) that they contravene article 3 of the constitution of this State.

To obtain a reversal of the judgment the plaintiff contends that the court had jurisdiction of the particular cause and that the respective statutes are not open to the constitutional objections interposed. The determination of these contentions necessitates a review of the pertinent provisions of the Occupational Diseases act.

Section 1 of that act (Cahill's Stat. 1933, p. 1375; Smith's Stat. 1933, p. 1401;) reads: "That every employer of labor in this State, engaged in carrying on any work or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employees to the danger of illness or disease incident to such work or process, to which employees are not ordinarily exposed in other lines of employment, shall, for the protection of all employees engaged in such work or process, adopt and provide reasonable and approved devices, means or meth-

ods for the prevention of such industrial or occupational diseases as are incident to such work or process." Section 2 provides that every employer engaged in the carrying on of any process of manufacture or labor in which lead derivatives or paris green is employed, used or handled, or the manufacture of brass or the smelting of lead or zinc, or in any process of manufacture or labor in which poisonous chemicals, minerals or other substances are used or handled by the employees therein in harmful quantities or under harmful conditions, shall provide clothing for the use of such employees while so engaged and shall maintain the clothing furnished in good condition, and in case of noxious or poisonous dusts shall provide adequate and approved respirators and maintain them in good condition for such employees. The succeeding eight sections, 3 to 10, inclusive, relate solely to employments within the provisions of section 2, and specifically prescribe not only the protective devices to be furnished by, but also the duties required of, such employers. Section 3 commands that every employer engaged in any process or manufacture referred to in the second section shall provide monthly medical examinations for the purpose of ascertaining the existence of industrial or occupational diseases. Sections 4 and 5 provide that the examining physician shall make immediate reports to the State Board of Health, which is directed to transmit copies to the Department of Factory Inspection. The sixth section prescribes that every employer under section 2 shall provide separate dressing rooms and lavatories for the use of employees who are exposed to poisonous or injurious dusts, fumes and gases. These lavatories are required to be maintained in a clean and wholesome manner and provided with adequate washing facilities. The dressing rooms, it is further provided, shall be furnished with clothes presses or compartments, to the end that the ordinary street apparel of such employees shall be kept separate from their working clothes. Section 7 requires

that special eating places and drinking-water facilities shall
be provided by employers engaged in any process or manu-
facture designated in the second section. By the eighth
section such employers are required to maintain adequate
devices for carrying off poisonous or injurious fumes and
injurious dust. It further provides that the floors be kept
in a smooth and hard condition, and that sweeping shall
be permitted during working hours only where the floors
are dampened to prevent the circulation of dust. The ninth
section declares that employers shall provide specified means
for the cleaning of flues in any process of manufacture
within section 2; that all floors shall be washed or scrubbed
at least once every working day; that work attended by
poisonous fumes, dusts and gases shall, where practicable,
be carried on in separate rooms and under cover of some
suitable device to remove the danger to the health of the
employees so far as may be reasonably consistent with the
manufacturing process, and that the fixtures and tools em-
ployed shall be thoroughly washed and cleaned at reason-
able intervals. The tenth section provides, among other
things, that all hoppers or chutes or like devices used in
the course of any process of manufacture referred to in
section 2 shall, where practicable, be provided with hoods
or coverings and an apparatus for drawing away from
the employees noxious, poisonous or injurious dusts. Sec-
tion 11 provides that in the enforcement of the provisions
of the act "the Department of Factory Inspection shall
give proper notice in regard to any violation of this act to
any employer of labor in violating it, and directing the in-
stallment of any approved device, means or method reason-
ably necessary, in his judgment, to protect the health of
the employees therein." It is also provided that "upon
receipt of such notice calling the attention of the employer
to such violation, he shall immediately comply with all the
provisions of this act." The twelfth section provides that
under certain circumstances it shall be the duty of the De-

partment of Factory Inspection to notify the employer to "install adequate and approved appliances, devices, means or methods to prevent the contraction and continuance of any such disease or illness and to comply with all the provisions of this act." Section 13 provides for the posting of notices of known dangers from occupations. Section 14 prescribes penalties for the violation of any of the provisions of the statute.

Subdivision (*a*) of section 15 provides that for any injury to the health of any employee proximately caused by any willful violation of or failure to comply with section 1 a right of action shall accrue to the injured employee for the direct damages sustained. In case death ensues, the right of action shall accrue to the widow, the decedent's lineal heirs or adopted children, or to any other persons who were before the employee's death dependent upon him for support. The damages which may be recovered shall not exceed $10,000, and the action must be instituted within one year after the employee's death. By subdivision (*b*)-1 of section 15 it is provided that if an employee's disability or death is caused by an occupational disease arising out of and in the course of his employment in one or more of the occupations referred to in section 2 of the act, he or his dependents, as the case may be, shall be entitled to compensation in the manner and subject to the terms, conditions and limitations prescribed by the Workmen's Compensation act. The disability of an employee so caused, the subdivision concludes, shall be treated as the happening of an accidental injury. Subdivision (*b*)-2 defines the words "occupational disease," used in subdivision (*b*) of section 15, as a disease peculiar and owing to the nature of an employment in one or more of the occupations referred to in section 2 of the act. Subdivision (*b*)-4 provides that no common law or statutory right to recover damages for injury or death sustained by any employee through an occupational disease arising out of and in the

course of his employment in one or more of such occupations, other than the compensation prescribed, shall be available to any such employee or any person dependent upon or otherwise claiming through or under him.

By this legislation the legislature recognized the existence of occupational diseases. (*Madison* v. *Wedron Silica Co.* 352 Ill. 60.) The statute, however, does not treat all such diseases, or the occupations in which they are contracted, in the same manner. Many occupational diseases covered by section 1 do not fall within section 2. Section 1 applies to industries in general where the character of the work is not deemed especially dangerous to the health of the employees. Section 2, on the other hand, covers certain industries which, because of their inherent characteristics, were considered by the legislature to be especially dangerous to the health of the employees working therein. Three classes of employments are covered by section 2, namely: (1) Those engaged in an industry using lead derivatives or paris green; (2) the manufacture of brass or the smelting of lead or zinc; and (3) any process of manufacture or labor in which poisonous chemicals, minerals or other substances are used in harmful quantities or under harmful conditions. (*Burns* v. *Industrial Com.* 356 Ill. 602.) Section 2 is more specific than section 1, not only with respect to the occupations covered by it but also in enumerating requirements for preventive measures. Furthermore, sections 3 to 10, inclusive, and all of section 15 except subdivision (*a*), relate exclusively to employments and employers within section 2. Sections 11, 12 and 13 pertain to the jurisdiction and duties of the Department of Factory Inspection. Sections 11 and 12 make it the duty of the Department of Factory Inspection to notify an employer of violations of section 1 and to direct the installation of approved devices, means or methods which in the judgment of that department might be reasonable and necessary. The provisions of section 1 contain the

only information in the entire act as to the employments within its scope.

Further recognition of the differences between the employments covered by sections 1 and 2 is found in the action of the General Assembly in 1923. Section 15 was amended and the application of the provisions of the Workmen's Compensation act was extended to all cases of occupational diseases arising out of the employments named in section 2. Section 1 was not amended and no changes were made in the mode of recovery for occupational diseases arising under it. The separate classification of occupations and remedies has been sustained. *Madison* v. *Wedron Silica Co. supra; First Nat. Bank* v. *Wedron Silica Co.* 351 Ill. 560.

In support of its first contention, that the trial court was without jurisdiction of the subject matter, the defendant places reliance on the cases of *Burns* v. *Industrial Com.* 356 Ill. 602, and *First Nat. Bank* v. *Wedron Silica Co. supra.* In the *Burns case* we held that section 2 applies to three classes of occupations. The defendant contends that the plaintiff's claim is based upon the words creating the third class. That classification includes employees "engaged in any process of manufacture or labor in which poisonous chemicals, minerals or other substances are used or handled by the employees therein in harmful quantities or under harmful conditions." This interpretation that there is a third class was arrived at by adding the word "or" between the words "employees" and "engaged" in order to give meaning to the thirty-one words just quoted from section 2. Without the word "or" the quoted words had no meaning. The word "poisonous" clearly modifies and restricts the meaning not only of the word "chemicals" but also the words "minerals" and "other substances." The third class thus covers especially dangerous occupations in which poisonous chemicals, minerals and other substances are used. A contrary construction would render the pre-

ceding words unintelligible and superfluous and would do the same to the whole of section 1. In *First Nat. Bank* v. *Wedron Silica Co. supra,* the action was for damages for a personal injury to an employee's health caused by exposure to and the inhalation of silica dust. It was stated that the silica industries were not included in the classification of section 2, and that it was for the legislature, and not this court, to determine whether increased knowledge concerning silicosis would warrant the transfer of the business of mining and processing silica from section 1 to section 2 of the Occupational Diseases act. The classification of industries as extra-hazardous and those not so hazardous remains unchanged.

The validity of section 1 will be next considered. The defendant maintains that its provisions are so incomplete, vague, indefinite and uncertain that they do not provide or establish a sufficiently clear or intelligible standard of duty, and also that it delegates legislative power in violation of article 3 of the constitution of this State. We have not before considered these constitutional objections to this section. To sustain the constitutionality of a statute against a particular contention is not decisive of its validity against subsequent attacks upon different constitutional grounds. A decision upholding the validity of a statute does not, therefore, preclude the same court from subsequently declaring it unconstitutional in another case in which the statute is assailed upon grounds other than those urged in the former case. Nor does the fact that a statute has been construed and applied during a long period of time necessarily make it valid and immune from attack. (*People* v. *Bruner,* 343 Ill. 146.) The Occupational Diseases act has been in force since May 26, 1911. In the *Bruner case* a statute enacted more than one hundred years before was held void. We are not precluded from considering the constitutional questions presented in this case.

The first section of the fourteenth amendment to the Federal constitution provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Section 2 of article 2 of the constitution of this State declares that "no person shall be deprived of life, liberty or property, without due process of law." Statutes which either forbid or require the doing of an act in terms so vague that men of common intelligence must necessarily guess at their meaning and differ as to their application do not constitute due process of law. (*Champlin Refining Co.* v. *Commission,* 286 U. S. 210; *Cline* v. *Frink Dairy Co.* 274 id. 445; *Connally* v. *General Construction Co.* 269 id. 385; *Mayhew* v. *Nelson,* 346 Ill. 381.) This requirement applies to both civil and criminal legislation. *Cline* v. *Frink Dairy Co. supra; Small Co.* v. *American Sugar Refining Co.* 267 U. S. 233.

Courts have been reluctant to adopt a definition of "due process of law" to be applied in all cases. A notable exposition of the due process clause is found in *United States* v. *Cohen Grocery Co.* 255 U. S. 81. In holding invalid for uncertainty the fourth section of the Food Control act of 1917, as amended in 1919, Mr. Chief Justice White said: "The sole remaining inquiry, therefore, is the certainty or uncertainty of the text in question—that is, whether the words 'that it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,' constituted a fixing by Congress of an ascertainable standard of guilt and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them. That they are not, we are of opinion, so clearly results from their mere statement as

to render elaboration on that subject wholly unnecessary. Observe that the section forbids no specific or definite act. It confines the subject matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below in its opinion, to the effect that to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury."

In *Cline* v. *Frink Dairy Co.* 274 U. S. 445, the provisions of an anti-trust law of the State of Colorado were held invalid. One provision of the act was that "no agreement or association shall be deemed to be unlawful or within the provisions of this act the object and purposes of which are to conduct operations at a reasonable profit or to market at a reasonable profit those products which cannot be otherwise so marketed." The court said: "Such an exception in the statute leaves the whole statute without a fixed standard of guilt in an adjudication affecting the liberty of the one accused. An attempt to enforce the section will be to penalize and punish all combinations in restraint of trade in a commodity when in the judgment of the court and jury they are not necessary to enable those engaged in it to make it reasonably profitable, but not otherwise. Such a basis for judgment of a crime would be more impracticable and complicated than the much simpler question in the *Cohen Grocery case* whether a price charged was unreasonable or excessive. The real issue which the proviso would submit to the jury would be legislative—not judicial. To compel defendants to guess on the peril of an indictment whether one or more of the re-

strictions of the statute will destroy all profit or reduce it below what would be reasonable would tax the human ingenuity in much the same way as that which this court refused to allow as a proper standard of criminality in *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 232, 233."

In *Connally* v. *General Construction Co.* 269 U. S. 385, an Oklahoma statute which prescribed a minimum wage for workmen in the execution of contracts with the State and imposed a fine or imprisonment for each day's violation was held invalid. The language attacked was, "that not less than the current rate of per diem wages in the locality where the work is performed shall be paid."

The constitutionality of another Oklahoma statute, which prohibited the production of crude oil or petroleum under such conditions as to constitute "waste," was presented for decision in *Champlin Refining Co.* v. *Commission,* 286 U. S. 210. In holding the statute invalid the United States Supreme Court said: "The validity of its provisions must be tested on the basis of the terms employed. In *Connally* v. *General Construction Co.* 269 U. S. 385, 391, this court has laid down the rule that governs here: 'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law.'" Referring particularly to the word "waste," the court pointed out that it had no definite meaning in the connection used and that no aid could be found in the common law. "In the light of our decisions," the court continued, "it appears upon a mere inspection that these general words and phrases are so vague and indefinite that any penalty prescribed for their violation constitutes a denial of due process of law. It is not the penalty itself that is invalid but the exaction of obedience to a rule or

standard that is so vague and indefinite as to be really no rule or standard at all."

In *Mayhew* v. *Nelson,* 346 Ill. 381, the statute provided that certain laborers and mechanics engaged in public works should be paid "not less than the prevailing rate of wages for work of a similar nature in the city, town, village or other civil division of the State in which the public work is located." The act was declared void for indefiniteness and uncertainty, and also because it delegated arbitrary power in violation of the fundamental law. We there said: "A legislative act which is so vague, indefinite and uncertain that the courts are unable by accepted rules of construction to determine with any reasonable degree of certainty what the legislature intended, or which is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, will be declared to be inoperative and void. * * * An act is void the language of which appears on its face to have a meaning but to which it is impossible to give any precise or intelligible application in the circumstances under which it is intended to operate."

In the light of the foregoing decisions the defendant's first contention as to section 1 must be sustained. The phrase, "any work or process which may produce any illness or disease peculiar to the work or process carried on, or which subjects the employees to the danger of illness or disease incident to such work or process to which employees are not ordinarily exposed in other lines of employment," is also assailed. This portion of section 1 in effect requires that every employer of labor in this State must know not only whether he is engaged in the pursuit of any work or process which may produce a particular illness or disease, but also whether such work or process may produce an illness or disease which is peculiar or special to the work or process carried on by him. In addition he must know whether the employment subjects his em-

ployees to the danger of illness or disease incident to such work or process to which employees are not ordinarily exposed in other lines of employment. It necessarily follows that an employer is required to possess accurate information not only as to the etiology of all occupational diseases to which his employees may be subject in the course of their employment, but also those to which the employees of other employers are subject in the course of their several employments. The mere statement of the proposition carries its own condemnation. If an employer had the requisite knowledge that the work or process carried on by him subjected his employees to the danger of illness or disease peculiar or incident to such work to which employees are not ordinarily exposed in other lines of employment, the difficult question would remain as to whether he came within the provisions of section 1. In the event he ascertained that the work of one other employer might produce an illness or disease common to both businesses even though the lines of employment were diverse in nature, he would be unable to obtain any information from the statute as to whether the illness or disease was peculiar to his employment. Again, entirely different lines of employment might produce an illness or disease peculiar and common to each of them but to no other employments. No guide is furnished an employer seeking to determine whether an illness or disease produced by his employment is one "to which employees are not ordinarily exposed in other lines of employment." The meaning of the word "ordinarily" as used in this respect is especially ambiguous. It is obviously impossible for any person reading the language attacked to discern with a reasonable degree of certainty to whom it applies or what illness or diseases fall within its general terms.

The expression "provide reasonable and approved devices, means or methods for the prevention of such industrial or occupational diseases as are incident to such work or process" appears in the last part of section 1. The stat-

ute fails, however, to empower any person or agency to determine what is a reasonable and approved device. Each employer of labor must place his own construction upon these general words without any guidance. Section 1 does not purport to fix a standard of conduct whereby an employer may with any degree of certainty know the duty that rests upon him under it. A device deemed reasonable by one employer might well be considered unreasonable by another. If a particular device be conceded to be reasonable the question of its approval remains. Whether the statute refers to approval by the employer using the device or to some other employer or employers engaged in the same line of business is not clear. The result is that each employer is required to determine, at his peril, what is a reasonable and approved device. If a court or a jury subsequently determines that the device used was not reasonable and approved he is subject to unlimited liability for his mistake of judgment. An honest attempt to comply with the law will not of itself afford him a defense.

The plaintiff argues, however, that a jury is especially equipped to determine the standard of reasonable and approved devices, and asserts that the history of the common law is replete with instances of juries passing on what is "reasonable." This argument ignores the fact that the liability here is of statutory origin and did not exist at common law. It is definitely settled that where words employed in a statute are unknown to the common law and are also shown to have no well-defined meaning in the particular industry to which they are directed, any duty enjoined upon an employer by such statute must fail for want of certainty. (*Champlin Refining Co.* v. *Commission,* 286 U. S. 210.) In that case it is said: "The general expressions employed here are not known to the common law or shown to have any meaning in the oil industry sufficiently definite to enable those familiar with the operation of oil wells to apply them with any reasonable degree of

certainty. The meaning of the word 'waste' necessarily depends upon many factors subject to frequent changes." Since the duties enjoined upon employers by section 1 in the present case are purely statutory, it is obvious that the common law affords neither precedent nor aid in interpreting the meaning of the words "reasonable and approved devices."

The plaintiff, however, cites and relies upon numerous decisions of the United States Supreme Court to sustain his contention that section 1 is not invalid. Of these, two decisions sustaining statutes as sufficiently certain rested upon the conclusion that they employed words or phrases having a technical or other special meaning well enough known to enable those within their reach to correctly apply them. (*Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Omaechevarria* v. *Idaho,* 246 id. 343.) The words assailed in *Nash* v. *United States,* 229 U. S. 373, were held to possess the requisite certainty because they had a well-settled common law meaning. Reliance is also placed upon seven decisions of this court. (*Witte* v. *McLaughlin,* 355 Ill. 463; *People* v. *Huls,* 355 id. 412; *People* v. *Mueller,* 352 id. 124; *Amberson* v. *Amberson,* 349 id. 249; *People* v. *Hassil,* 341 id. 286; *Kowalczyk* v. *Swift & Co.* 329 id. 308; *People* v. *Lloyd,* 304 id. 23.) No useful purpose would be served by analyzing the facts and decisions in these cases. It suffices to say that we are of the opinion that each of them was decided correctly and that nothing there said conflicts with the views expressed here. The statutes construed in the cases cited were reasonably clear and free from ambiguity. The ambiguity of the language employed in section 1 is patent.

The plaintiff also relies upon *Boll* v. *Condie-Bray Glass and Paint Co.* 321 Mo. 92. Section 6817 of the Missouri Revised Statutes, (1919,) analogous to section 1 of our Occupational Diseases act, uses the word "effective" instead of "reasonable" to modify "devices." The phrase

"not ordinarily exposed in other lines of employment," in the Illinois statute, does not occur in the Missouri law. The argument of the defendant in the case cited, that provision was wanting as to who should approve of the devices prescribed, was answered dogmatically with the statement, "We cannot agree with counsel's argument." Referring to the meaning of the word "approved," the court expressly held that it was not used in the sense that the device should be approved by one particular person or one particular State official, "but that said word was rather used in the sense that the public approved such means, method or device, and adopted or recognized it as a suitable means to prevent the injury which law-makers hoped to avoid." This court is committed to a contrary doctrine. (*People* v. *Barnett,* 344 Ill. 62.) The case of *Boll* v. *Condie-Bray Glass and Paint Co.* finally turned on the point that the defendant could not raise the constitutional question since it had made no attempt to comply with the act.

The contention is also made that section 1 contravenes article 3 of the constitution of this State on the ground its provisions constitute an unwarranted and void delegation of legislative power to courts and juries. By article 3 the powers of government in this State are divided into three separate and distinct departments. Each department is to perform the duties assigned to it and no department may exercise the powers properly belonging to either of the other two. (*City of Chicago* v. *Matthies,* 320 Ill. 352; *Saxby* v. *Sonnemann,* 318 id. 600.) Although the General Assembly cannot divest itself of its inherent function to decide what the law shall be, it may authorize others to do those things which it might properly but cannot understandingly or advantageously do itself. (*Lydy* v. *City of Chicago,* 356 Ill. 230; *Welton* v. *Hamilton,* 344 id. 82; *Block* v. *City of Chicago,* 239 id. 251.) The fundamental distinction is between a delegation of power to make the law, which involves a discretion as to what the law shall

be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; the latter is unobjectionable. 1 Lewis' Sutherland on Stat. Const. (2d ed.) sec. 88; *Lydy* v. *City of Chicago, supra; Welton* v. *Hamilton, supra.*

It will be observed that there is no provision in the Occupational Diseases act delegating to any administrative officer the power to determine by general rules what diseases or illnesses are incident or peculiar to any given line of work, or to prescribe by general rules what devices, means or methods are "reasonable and approved." It cannot be said that sections 11 and 12 delegate such power to the Department of Factory Inspection. The power granted to the department to direct the installation of any approved device, means or method reasonably necessary, in the judgment of the inspector, to protect the health of the employees in a given business can be exercised only after he shall have ascertained that there has been a violation of the act. The powers conferred upon the department are not those of direction and initiation pursuant to general rules by which employers may shape their conduct in the first instance, but are mere powers of correction following a violation of the act. Nor can reasonableness or approval be left to the judgment of the people, for the reason that the legislature lacks power to cast back upon the people at large those legislative powers which have been granted to it by the constitution. *(People* v. *Barnett,* 344 Ill. 62.) It cannot rest with the court and jury in each particular case. (*United States* v. *Cohen Grocery Co.* 255 U. S. 81; *Louisville and Nashville Railroad Co.* v. *Railroad Commissioners of Tennessee,* 19 Fed. 679.) The only recourse left to the employer under section 1 is to use his own judgment. The General Assembly has failed to establish a standard or rule of action. The section is therefore void.

The defendant also contends that sections 12 and 13 of an act entitled, "An act to provide for the health, safety and comfort of employees in factories, mercantile establishments, mills and workshops in this State, and to provide for the enforcement thereof," etc., are open to the same constitutional objections made against section 1 of the Occupational Diseases act. Section 12 of the former act provides as follows: "All factories, mercantile establishments, mills or workshops shall be kept free from gas or effluvia arising from any sewer, drain, privy or other nuisance on the premises. All poisonous or noxious fumes or gases arising from any process, and all dust of a character injurious to the health of the persons employed, which is created in the course of a manufacturing process, within such factory, mill or workshop, shall be removed, as far as practicable, by either ventilating or exhaust devices." Section 13 reads, in part, as follows: "All decomposed, fetid or putrescent matter, and all refuse, waste and sweepings of any factory, mercantile establishment, mill or workshop, shall be removed and disposed of, at least once each day and in such a manner as not to cause a nuisance; and all cleaning shall be done, as far as possible, outside of working hours; but if done during working hours, shall be done in such a manner as to avoid the unnecessary raising of dust or noxious odors." The expressions "shall be removed, as far as practicable," in section 12, and "shall be done in such a manner as to avoid the unnecessary raising of dust or noxious odors," in section 13, render those sections void for vagueness, indefiniteness and uncertainty and for an attempted delegation of legislative power. The reasons set forth with respect to the invalidity of section 1 of the Occupational Diseases act are applicable also to sections 12 and 13 of the Health, Safety and Comfort act.

The judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*