Nick Meyerson *et al.*, Plaintiffs-Appellees, *v.* James Y. Carter, Public Vehicle Licensing Commissioner of the City of Chicago, *et al.*, Defendants-Appellants—(Edward V. Hanrahan, State's Attorney of Cook County, Defendant.)

(No. 58251;

First District (2nd Division)—August 13, 1974.

74

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan and Robert R. Retke, Assistant Corporation Counsel, of counsel), for appellants.

Miller & Schneider, of Chicago, for appellees.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The circuit court of Cook County held unconstitutional the "Taxicabs-bulletproof shields" statute (Ill. Rev. Stat, 1972 Supp., ch. 95½, par. 12—605),[1] finding it to be so vague and indefinite that it is judicially unenforceable. Judgment was entered permanently enjoining enforcement of the statute. Defendants' appeal challenges the correctness of the ruling.

Approximately 2½ years after the effective date of the statute, plaintiffs Nick Meyerson, an owner-operator of a taxicab operating pursuant to a license issued by the city of Chicago, and American United Cab Association, a taxicab affiliate acting on behalf of its affiliated members, i.e., independent taxicab owners and operators, filed their verified complaint for declaratory judgment and injunction.

The defendants-appellants are James Y. Carter (hereinafter Carter), Public Vehicle Licensing Commissioner, and James Conlisk, Commissioner of Police, of the city of Chicago. The State's Attorney of Cook County, joined as a defendant after the original complaint was filed, did not appeal. A temporary injunction issued and, after the subsequent bench trial, the trial court declared the statute to be unconstitutional.

Plaintiffs' complaint alleged that various members of American United, including plaintiff Meyerson, were notified by Carter on March 6, 1972, that, unless they complied with the statute within 30 days, their right to operate their cabs would be suspended. Plaintiffs proceeded to attack the validity of the statute alleging that its provisions violated the due process and equal protection clauses of both the United States and Illinois constitutions; that the statute constituted an invalid exercise of the police power by compelling a citizen to guard his own safety without

---

[1] The original statute as passed August 28, 1969, was identified as ch. 95½, pars. 441-442, and is:

"In municipalities with 1,000,000 or more population, any taxicab manufactured, owned or operated after September 1, 1970, and regularly operated in such a municipality must have a bulletproof shield completely separating the driver's seat from the back seat.

      \*     \*     \*

Any person owning a taxicab which is in violation of this Act shall be fined not to exceed $500."

At the time plaintiffs brought this action, the citation of the statute had been changed to chapter 95½, section 12-605 with no significant change in the statutory language.

benefiting the general public; that the bulletproof shield endangers the health, safety, and comfort of the cab operator as well as his passengers; that the statute draws an unreasonable classification; and that it is vague and unclear in that it fails to specify the standards with which the bulletproof shield must comply.

In their answer to the complaint, defendants admitted the facts giving rise to plaintiffs' action as stated by plaintiffs; denied that the statute was unconstitutional or its enforcement illegal; affirmatively stated that the statute is a valid exercise of the state's police power intended to regulate those persons who use public ways for private profit; denied plaintiffs' allegations that the shield endangers the operator and passengers stating further that such cannot properly support an allegation that a statute is unconstitutional; and denied the remainder of plaintiffs' allegations concerning an unreasonable classification and vagueness of the statutory language. Defendants also asserted that the plaintiffs were guilty of *laches* in seeking the temporary injunction.

So far as resolving the issues raised in this appeal, the significant testimony may be summarized as follows.

John H. Andrews, a mechanical engineer specializing in vehicles, testified on behalf of plaintiffs as an expert witness. He stated that, according to accepted standards within the glass industry, the transparent material used in various bulletproof shields examined on taxicabs operating in the city of Chicago would not be considered "bullet proof." Referring to the standards published by the American Society of Mechanical Engineers and the Insurance Institute for Highway Safety, Andrews described the four types of bullet-resistant glass defined by those standards, to wit:

"Type MPW, a nominal thickness of an inch and three-sixteenths which is ballistically resistant to medium powered small arms ammunition;

Type HP which is one and nine-sixteenths inch, which is ballistically resistant to high powered small arms ammunition;

Type SP which is an inch and three-quarters thick which is resistant to super powered small arms ammunition; and the fourth type,

Type RR which is two inches thick are [*sic*] ballistically resistant to high powered rifle ammunition."

Asked by the court whether the term "bullet proof" was synonymous with the term "bullet resistant," Andrews stated "It is the same generic type of definition." The court then inquired whether one could have type MP glass and still be considered to have bulletproof glass. This witness responded that such would be bullet resistant to small arms ammunition.

Andrews further testified that the three-quarter-inch and three-eighths-

inch material presently used in the shields is not bullet resistant and that, should someone fire a bullet through material of that thickness, the bullet would not only come through the shield with a great deal of energy, but fragments of plastic would also be accelerated forward.

On cross-examination Andrews stated that he had examined approximately seven shields; that all materials have some bullet-resistant qualities, but that plastic is not as strong as glass when it comes to resisting the impact of a bullet. He further testified that the terms "bullet proof" and "bullet resistant" imply the same idea noting though that a piece of 2-inch steel is bullet proof since a bullet cannot pierce it; that, on the other hand, while a piece of glass or plastic will reduce the bullet's energy, the bullet can penetrate the substance.

Anthony Bottalla, president of the plaintiff American United Cab Association, testified that Carter's office had notified him by letter in March 1971 that the statute in question had been passed; that he then contacted the office of the governor of the State of Illinois, the enforcing unit of the city of Chicago, and Carter, requesting the specifications of the particular bulletproof shield which Carter requested them to install; that he received no specifications; and that, when he talked to Carter he asked him what is the requirement of the law, to which Carter replied: "The law is not specific to the dimension or the size or the thickness."

Defendants called two witnesses who testified concerning their experience with cabs equipped with a so-called bulletproof partition.

Defendants also called Alfred Halloway, chairman of the safety committee of the Democratic Union Organization, Local 777, who testified that approximately 4,800 taxicab drivers belonged to the union and that, prior to passage of the statute in question, he had circulated a petition favoring installation of such shields and had accumulated nearly 3,500 signatures.

Defendant Carter testified that after passage of the statute he notified by letter the taxicab owners of the passage of the statute in question; that all of the Yellow and Checker cabs (approximately 80% of the city cabs) had shields presently installed and that about 60% of the independent cabs in the city are presently equipped with the shields; that "there is no such thing as bullet proof"; that at the time of the statute's passage he did not know whether bullet-resistant shields were made, although there were advertisements for such in trade journals; and that, from tests conducted at the police testing range, it was discovered that only two types of transparent material were bullet resistant.

On cross-examination Carter stated that, as commissioner, he has a statutory duty to examine the bodies of taxicabs once each year and a duty, by ordinance, to perform such examinations twice annually. When

asked whether his office has formulated any particular statistic, dimension or type of shield, Carter stated that:

> "I am in no position to tell anybody what to buy. I am only in a position to tell them what they cannot use. And my understanding has been that there are two products that I know that will withstand this type of beating and anything else you can find for me that has passed the Bureau of Standards."

The trial court found the statute to be judicially unenforceable solely on the ground that its language was too vague and indefinite.

Defendants urge on appeal that in so ruling the trial court ignored the intent of the legislature as well as the special meaning which the term "bulletproof shield" has acquired within the taxicab industry. Further, defendants urge that the plaintiffs are guilty of *laches* (by waiting 2½ years before filing suit) and thus have waived their right to question the validity of the statute.

## I.

■■ The cardinal principle in construing a statute is to give effect to the true intent and meaning of the legislature. See *People ex rel. Hanrahan v. White* (1972), 52 Ill.2d 70, 73, 285 N.E.2d 129; *People v. Wallace* (1974), 57 Ill.2d 285.

The subject statute was first passed by our General Assembly in 1969 and became effective August 28, 1969. It applied only to municipalities with 1,000,000 or more population—thus only to the city of Chicago.

The evidence before the trial court established that the safety committee of a taxi drivers union of Yellow and Checker cabs in Chicago presented to the legislature, prior to the passage of the statute, a petition signed by approximately 3,500 cab drivers requesting the installation of the bulletproof shield.[2]

The language of the statute leaves no doubt of the intent of the General Assembly to eliminate the possibility of armed assaults upon cab drivers by passengers bent upon robbing the drivers. To this end the statute compels installation of a "bulletproof shield" in each cab manufactured, owned, or operated after September 1, 1970 and regularly operated in a municipality having a population of 1,000,000 or more under pain of a $500 fine. Thus the legislature has created a penal statute and, accordingly, its essential elements must be so clearly expressed that the ordinary person can intelligently choose in advance the lawful course

---

[2] The installation of the shield was also involved in negotiations in 1967 and 1968 between the union and their employers.

to pursue. *Connally v. General Construction Co.* (1925), 269 U.S. 385, 393, 70 L. Ed. 322, 46 S. Ct. 126.

The controversy in the instant case centered around the legislature's use of the phrase "bulletproof shield." The record clearly reveals the trial court's conclusion that the phrase is too indefinite and susceptible of too many interpretations to form the basis of criminal liability. This conclusion is amply supported by the testimony of John Andrews, a mechanical engineer, that the material presently used in Chicago cabs is not bullet proof; that the capacity of a piece of glass to resist a bullet's impact depends upon the thickness of the glass as well as the type of bullet and weapon from which it is discharged; that plastic is less bullet resistant than glass; and that none of the shields he inspected would resist the impact of even small-arms ammunition. Further, Anthony Bottalla, president of the plaintiff association, stated that, upon his inquiry, defendant Carter was unable to specify the type of shield required by law. Carter himself testified that "there is no such thing as bullet proof" and that, at the time of the statute's passage, he did not know whether bullet-resistant shields were made.

Defendants contend nonetheless that the phrase "bulletproof shield" has acquired a special but commonly understood meaning throughout the industry. This position, they maintain, is supported by defendant Carter's testimony that the majority of cabs in Chicago are equipped with a shield and by testimony of a number of plaintiffs' witnesses that shields had been installed in their cabs. It must be noted though that there is no testimony to the effect that these shields were, in fact, bullet proof.

Defendants also point to defendant Carter's acknowledgment that various shields (claimed to be bulletproof by their manufacturers) were advertised in taxicab journals, but the significance of this statement is somewhat diluted by defendant Carter's testimony that one product for which he received a mailed advertisement was "not bullet anything," *i.e.,* it was not at all bullet resistant.

■■ Considering these factors in light of Andrews' testimony that the standard for determining a material's resistance to bullets is a variable one and Bottalla's statement that Carter was unable to specify the type of shield required by the statute, it cannot be said that the phrase "bulletproof shield" has acquired such a well-defined meaning as to enable one engaged in the trade to correctly apply it (*cf. Hygrade Provision Co. v. Sherman* (1925), 266 U.S. 497, 502, 69 L. Ed. 402, 45 S. Ct. 141).

■■ Accordingly the trial court properly found the statute in question to be unconstitutionally vague for, as stated by our supreme court in a

case involving an occupational-disease statute, *Vallat v. Radium Dial Co.* (1935), 360 Ill. 407, 412-13, 196 N.E. 485:

> "In order that a statute may be held valid the duty imposed by it must be prescribed in terms definite enough to serve as a guide to those who have the duty imposed upon them. Such definiteness may be produced by words which have a technical or other special meaning well enough known to permit compliance therewith or words which have an established meaning at common law through decisions; but if the duty is imposed by statute through the use of words which have not yet acquired definiteness or certainty and which are so general and indefinite that they furnish no such guide the statute must be declared to be invalid."

As noted above, in the instant case there was sufficient evidence to support the conclusion that no one standard defining "bulletproof shield" exists within the glass or related industries. Such being the case, cab-owners are left to choose, at their peril, which type of bullet-resistant material to install in their vehicles.[3]

Defendants suggest that such a standard presently exists since Carter's office had conducted tests at the police testing range and found that two types of transparent material were bullet resistant. When asked, though, whether his office had formulated any particular standard, Carter replied:

> "I am in no position to tell anybody what to buy. I am only in a position to tell them what they can not use. And my understanding has been that there are two products that I know that will withstand this type of beating and anything else you can find for me that has passed the Bureau of Standards."

Thus, while two types of material are presently acceptable to the office enforcing the statute's mandate, the fact remains that no definite, ascertainable set of standards has yet been adopted. Under these circumstances this court is not in a position to require compliance with the statute for, as the trial court commented:

> "There is no great hardship in draftmanship for the legislature to say that the particular shield shall be of such and such a thickness and shall be resistant to a certain extent, or even to enable the Commissioner of Vehicles to set up standards."

This principle is clearly set out in *Mayhew v. Nelson* (1931), 346 Ill. 381, 387, 178 N.E. 921, to wit:

---

[3] For example, having chosen type MPW glass they might later be informed they have violated the statute since the material used must be resistant to super-powered small arms as well as to medium-powered small arms.

"A law must be complete in all its terms and conditions when it leaves the legislature, so that every person may know, by reading the law, what his rights are and how it will operate when put into execution. [Citations.] While it is the duty of the courts to ascertain the meaning of and to give effect to every valid act of the legislature, yet they cannot supply omissions or remedy defects in matters committed to the legislature."

■■ Plaintiffs suggest that the bulletproof-shield statute was an improper exercise of police power by the state, resulting in an unconstitutional restraint upon the personal freedom of taxicab licensees (see section 2 of article II of the 1870 Constitution of the State of Illinois and article I, section 2 of the 1970 Constitution). Plaintiffs recognize that the state, acting under its police powers, may enact legislation if the evil sought to be remedied affects the public health, safety, morals, or general welfare. *People v. Fries* (1969), 42 Ill.2d 446, 250 N.E.2d 149.

The record here clearly indicates that the instant legislation was enacted in response to a plea by an overwhelming number of taxicab drivers in the city of Chicago favoring installation of a bulletproof shield.

■■ It should be noted that the legislature is vested with broad discretion to determine not only what the public interest and welfare require, but also what measures are necessary to secure such interests (*Tometz v. Board of Education* (1968), 39 Ill.2d 593, 600, 237 N.E.2d 498; *Thillens, Inc. v. Morey* (1957), 11 Ill.2d 579, 593, 144 N.E.2d 735). The language of the statute here leaves no doubt of the legislature's intent to eliminate the possibility of armed assaults upon cab drivers by their passengers. We recognize the primary result of a bulletproof-shield statute will be to protect the cab driver, but we also believe the general public can also benefit by reducing crime and increasing the public safety on the streets in the city of Chicago (see *People v. Roe* (1971), 48 Ill.2d 380, 270 N.E.2d 27). Be that as it may, the indicated infirmity of this particular statute outweighs the obvious intent of the legislature.

## II.

Defendants lastly urge that plaintiffs have waived their right to question the legality of the legislation since they did not seek to enjoin enforcement of the statute until 2½ years after the effective date of the statute. They point out that a majority of the cabs in Chicago are equipped with the partitions, and that the statute had been challenged in two previous actions in the circuit court of Cook County and found valid each time. The trial court, before granting the temporary injunction in the instant cause, found that the issue concerning the deprivation

of plaintiffs' individual rights and liberties without promoting a purpose that is beneficial to the public was not presented to the court in the other two cases.

Defendants suggest that this court follow the holding of the New York Supreme Court in *Scherr v. City of New York* (1967), 55 Misc. 2d 176, 284 N.Y.S.2d 775, where the petitioner sought to enjoin enforcement of a regulation "requiring a partition between the front and rear seats of all taxicabs operating for hire between 8:30 P.M. and 6:30 A.M." (284 N.Y.S.2d at 776.)[4] Having upheld the validity of the regulation on the ground that one who engages in a publicly regulated business surrenders his right to unfettered discretion in the conduct of that business, the court added that by waiting for many months to seek judicial relief, while many in the industry incurred expenses in reliance upon the regulation, the petitioner was guilty of *laches*.

■■ As is demonstrated by the case of *Parks v. Libby-Owens-Ford Glass Co.* (1935), 360 Ill. 130, 195 N.E. 616, our supreme court has taken a contrary position, to wit:

> "To sustain the constitutionality of a statute against a particular contention is not decisive of its validity against subsequent attacks upon different constitutional grounds. A decision upholding the validity of a statute does not, therefore, preclude the same court from subsequently declaring it unconstitutional in another case in which the statute is assailed upon grounds other than those urged in the former case. Nor does the fact that a statute has been construed and applied during a long period of time necessarily make it valid and immune from attack." (360 Ill. at 139.)

See also *Berk v. County of Will* (1966), 34 Ill.2d 588, 593-94, 218 N.E.2d 98; *Grasse v. Dealer's Transport Co.* (1952), 412 Ill. 179, 184-85, 106 N.E.2d 124; *Schuman v. Chicago Transit Authority* (1950), 407 Ill. 313, 315, 95 N.E.2d 447; *Community Consolidated School District No. 210 v. Mini* (1972), 5 Ill.App.3d 807, 815, 284 N.E.2d 343.

■■ In the instant case the trial court considered the issue of *laches* during the course of the hearing held to determine whether a temporary injunction should issue. Cognizant of the above-stated principle, it concluded that it would hear the case since the claim of vagueness had not been raised in the prior cases and, assuming the truth of plaintiffs' allegations, they created factual questions that would have probative value in determining the constitutionality of the statute. Thus the trial

---

[4] Neither the wording or the citation of the New York regulation is given in the reported opinion. The precise wording of the regulation, or lack of it, was not in issue.

court's decision on this issue was in accord with the position taken by our supreme court.

For these reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

HAYES, P. J., and LEIGHTON, J., concur.

