(No. 30417.—

THE PEOPLE *ex rel.* George F. Barrett, Attorney General, Petitioner, v. BRAINARD F. ANDERSON, County Clerk, Respondent.

*Announced orally Nov. 21, 1947—Opinion filed Dec. 26, 1947.*

GEORGE F. BARRETT, Attorney General, of Springfield, (WEYMOUTH KIRKLAND, HOWARD ELLIS, CHARLES A. THOMAS, OWEN RALL, WALTER V. SCHAEFER, and WILLIAM C. WINES, all of Chicago, of counsel,) for petitioner.

A. FRED KENDALL, State's Attorney, of Watseka, and ALBERT E. JENNER, JR., of Chicago, for respondent.

Mr. JUSTICE GUNN delivered the opinion of the court:

On September 16, 1947, the People of the State of Illinois, on the relation of George F. Barrett, Attorney General, filed a petition in this court for an original writ of *mandamus* against Brainard F. Anderson, county clerk

of Iroquois County, to require him to comply with the provisions of the recent Reapportionment Act, entitled "An Act to apportion the State of Illinois into twenty-six Congressional districts and to establish the same and to provide for the election of representatives therein and to repeal an act therein named." (Ill. Rev. Stat. 1947, chap. 46, par. 156a *et seq.*) The court granted the petition and ordered the defendant to answer, and upon respondent filing his answer to the petition for writ of *mandamus,* the petitioner filed a general demurrer thereto, and upon the issues thus formed the parties filed their respective briefs, and on November 20, 1947, argued the cause orally in this court.

It appearing that the matter involved in the cause was of great public importance, and that an early decision was necessary to prevent confusion in the selection of candidates for Congressional offices in the primary election for the Spring of 1948, because of the claim of respondent that the Apportionment Act of 1901, which provided for different districts, was the only legal act in effect, the court thereupon, after the closing of the arguments, considered the case as presented by the petitioner and the respondent, and an announcement was made on November 21, 1947, ordering the writ of *mandamus* to issue against Brainard F. Anderson, as county clerk of Iroquois County, as prayed in the petition, and that the opinion of the court be rendered as the convenience of the court would permit.

The petition alleged that the act referred to above was enacted at the 65th General Assembly of Illinois, was signed and approved by the Governor on June 26, 1947, and became a law and went into effect upon that date, and attached a copy of such law as an exhibit to the petition. It was further alleged that the county of Iroquois was by said act included in the 17th Congressional District, and that under the Apportionment Act of May 13, 1901, said county con-

stituted a part of the 18th Congressional District; that said Anderson was the duly elected and qualified county clerk of Iroquois County and required by the Election Code of the State of Illinois to prepare the notice of primary elections within said district, and that he had stated and declared that he had been advised that the Apportionment Act of 1947, placing his county in the 17th Congressional District, was unconstitutional and void, and that the act of May 13, 1901, was still in force and effect, and that he, in the coming primary of 1948, would disregard the recent act of 1947 and would proceed under the act of 1901. It was further alleged that if respondent persisted in his announced intention to follow the earlier act he would give notice of a primary election to be held in April, 1948, for offices from the 18th Congressional District, whereas under the act of 1947, his county was within the 17th Congressional District, with the result that congressional officers would not be legally nominated or elected if the said respondent persisted in his announced intention. Other facts are alleged setting forth more in detail the confusion which would arise from such action, and prayed that a writ of *mandamus* be issued to compel him to comply with the Apportionment Act of 1947.

The respondent filed his answer and admitted his announced intention of following the act of 1901 and in declaring the Apportionment Act of 1947 unconstitutional and void, and, among the principal objections to the validity of the said act, alleged that certain territory, being a portion of the township of Stickney in Cook County, Illinois, was not assigned to any of the congressional districts but was omitted entirely, and the electors of said territory were thus deprived of the constitutional right to vote; and that certain other errors in description were made, whereby there was no proper description of the boundaries of the Eleventh and Thirteenth Congressional Districts; nor of

the Sixth and Tenth Congressional Districts; nor of the Third and Fifth Congressional Districts; all of which will be referred to with more particularity hereafter.

The answer also set out that the populations of the several districts under the act of 1947 are so disproportionate that there is no approximation of equality in population among and between the several districts as required by the constitution of the State of Illinois, and that for this reason the act is unconstitutional and void. The details of the matters pertaining to these objections are set forth with great particularity in the answer, so that all of the details of the legislation, from the introduction of the bill to its enactment and approval and signing by the Governor, are disclosed.

To this answer the petitioner filed a general demurrer, thus creating an issue of law upon which briefs and arguments were presented to this court. The petitioner claims the intention of the legislature is clearly indicated, and that it undertook to, and did include all of the territory of the State of Illinois within the several districts, and that the same are clearly described, and that the inaccuracies, if any, were a mere matter of mistake, and that the alleged inaccuracies in describing said districts will by a proper construction or interpretation of the language used conform with the manifest intention of the General Assembly.

On the other hand, the respondent claims there was a clear omission to include certain territory within the boundaries of some one or more of the districts, and that there was a complete lack of description of boundaries in certain other districts, so that the boundary lines could not be ascertained with certainty, thereby rendering the entire act incomplete and invalid.

The decision of this case involves a single question of the intent of the General Assembly of the State of Illinois in enacting the law of apportioning the territory of the State into Congressional Districts. If the General Assem-

bly intended to include all of the territory of the State in the several districts, and this may be ascertained from an examination of the law as a whole, language may be made to conform to the intention. On the other hand, if all of the territory within the boundaries of the State is not included within the description of the several districts, and cannot by reasonable construction be assigned to any district, thus depriving a part of the population of the State of the right to vote for the representation in Congress, then such omission would invalidate the act.

The first and principal objection urged by the respondent is the claim that a part of Stickney Township is not included with any district, thus constituting an omission fatal to the law. The rule for the guidance of courts in such a case is to ascertain the intention of the legislature and not its mistakes either as to the law or facts. The only question is, has the legislature expressed its purpose intelligently? If it has, the act is valid and must be upheld. (*People* v. *Penman,* 271 Ill. 82; *Patton* v. *People ex rel. Sweet,* 229 Ill. 512; *People* v. *VanBever,* 248 Ill. 136.) The question in any case of statutory construction is one of soundly seeking and tolerantly effectuating convincing legislative intention. (*United States* v. *Rosenblum Truck Lines,* 315 U.S. 50, 86 L. ed. 671.) Thus, it is the language of the act as a whole that is to be read and not words of a section or provision in isolation, "for courts will construe the details of an act in conformity with its dominating general purpose." *Securities and Exchange Com.* v. *Joiner Leasing Corp.* 320 U.S. 344, 88 L. ed. 88.

So, while courts are and should be cautious about adding words, as such, to a statute generally, they will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects. (*Elizabeth*

*Arden Sales. Corp.* v. *Gus Blass Co.* 150 Fed. 2d 938.) We have held in *Burns* v. *Industrial Com.* 356 Ill. 602, "The primary purpose of statutory construction is to arrive at the legislative intent. (*People* v. *Talbot*, 322 Ill. 416.) In order to arrive at this intent the several provisions of the statute are to be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and plan thereof as therein expressed. (*Public Utilities Com.* v. *Monarch Co.* 267 Ill. 528.) If this intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such legislative intention. [Citations.]" And, also, we have held in *Smith* v. *County of Logan,* 284 Ill. 163, "The object of construing a statute is to ascertain and give effect to the intention of the legislature. The intention of the law-makers is the law. It is to be gathered from the necessity or reason of the enactment and the meaning of the words, enlarged or restricted according to their real intent. In seeking this intention the court will always have regard to existing circumstances, contemporaneous conditions, the object sought to be attained by the statute and the necessity or want of necessity for its adoption. It must also have in mind the language used by the legislature, the evil to be remedied and the object to be attained. In construing a statute the court will not be confined to its literal meaning. A thing within the intention is regarded within the statute although not within the letter. A thing within the letter is not within the statute if it is not within the intention. When the intention has been thus ascertained from the reading of the statute, words may be modified or altered so as to obviate all inconsistencies with such intention."

This leads us to a consideration of the description of the Fifth District, around which one of the principal controversies centers. This district is described as follows: "The Fifth District shall be composed of that part of the

Eleventh ward south of the center line of west Thirty-first street, the Twelfth ward, that part of the Thirteenth ward north of the center line of west Sixty-fifth street, the Fourteenth ward, the Fifteenth ward, and that part of the Sixteenth ward north of the center line of west Fifty-ninth street, all in the City of Chicago; and the village of Stickney in Cook County."

Immediately south of Sixty-fifth Street and to the east of Harlem Avenue lies the part of Stickney Township omitted by this description, and claimed to be a part of the Fifth District. If the word *township* had been used instead of the word *village* it would have been included in the Fifth District. This particular territory is bounded as follows: On the north by a part of the Thirteenth Ward; on the east by the Third Congressional District; on the south and west by parts of the Fourth Congressional District. The east boundary of the Fourth Congressional District is the east line of Lyons Township, and runs north and south along the west line of Stickney Township, including this omitted portion. Part of the north boundary of the Fourth District is in the north boundary of Worth Township, which runs east and west along the south side of Stickney Township, and the omitted part thereof herein involved. The west boundary of the Third Congressional District is Cicero Avenue, which is the east line of that part of Stickney Township excluded from the description of the Fifth District. It is therefore apparent that this territory is not included in either the Third District or the Fourth District, because they have precise descriptions which do not include nor cover the territory in question, and it is not included within the Fifth District, unless the legislative intent was to use the words "township of Stickney" instead of the "village of Stickney."

The question then is, did the legislature intend to omit this territory from any district, or did it make a mistake in the description of the Fifth Congressional District?

There are several facts from which the legislative intent may be determined. There had been no reapportionment of Congressional Districts for more than forty years, and the population in the several districts had become disproportionate. The act of 1947, by section 1, provides: "The State of Illinois is apportioned into twenty-six Congressional districts, * * * as herein set forth." This indicates the entire State is apportioned, and that the twenty-six districts include the whole of its territory, and negatives beyond any question an intent to leave a territory about three miles square out of any district.

Where was this territory intended to be placed? As indicated above, the boundaries of the district to the west, south, and east exclude it from that territory. The General Assembly, while preparing the act, had before it a map of each district, which indicated that this omitted tract was to be a part of the proposed Fifth District, and it was a part of the territory known as Stickney Township. No town by the name of Stickney is contained in the Third and Fourth Districts, although the territory of each is principally described as consisting of townships, but on the contrary the village of Stickney within Stickney Township is in the Fifth District, and the words "the township of Stickney" instead of the words "the village of Stickney" would form a perfectly described tract for a district, leave no territory omitted, would conform to the map used to assign to Cook and Lake Counties thirteen districts, and contain almost the average of population of other districts, and describe the district by township territory, as used in the description of surrounding districts.

Respondent contends this is a case of omitted territory. This would be true if we attributed to the legislature an intent to exclude it, as ascertained from construing the entire act, but when the undoubted purpose of the legislature was to put all the territory of the State into twenty-six congressional districts, we will make the words of the

act conform to the intention, if it can be reasonably done. Occasions have arisen in the past in which the intent of the legislature was ascertained and enforced, where the mistakes were more pronounced than here.

In *Indiana, Illinois and Iowa Railroad Co.* v. *People ex rel. Baker,* 154 Ill. 558, the legislature in extending the boundaries of a township used range 9 by mistake instead of range 7. This was, of course, several miles from the boundaries of the territory which was being extended, but to effectuate the intention of the legislature we held that the words "range 9" could be construed as "range 7," saying: "In the construction of a statute the main consideration is to ascertain and give effect to the intention of the legislature. Here the legislature was enacting a law under which the inhabitants of certain territory should become incorporated, and the question, so far as this record is concerned, is what territory the legislature intended should fall within the provisions of the act." It was held that it was "sufficient authority to warrant a departure from the words of a statute when to follow them would lead to an absurd consequence."

In *Cruse* v. *Aden,* 127 Ill. 231, we held that "In the construction of a statute, the courts are not confined to the literal meaning of the words in the statute, but the intention may be collected from the necessity or objects of the act, and its words may be enlarged or restricted according to its true intent." So, in the case of *County of Perry* v. *County of Jefferson,* 94 Ill. 214, the literal language of the statute was disregarded to avoid the absurd consequence of throwing a tract of land into Jefferson County when obviously the legislature intended it to be in Perry County, when all of the facts before the legislature were properly considered. Thus, also, in *People ex rel. Bussey* v. *Gaulter,* 149 Ill. 39, the words "one hundred thousand" were construed to mean "seventy thousand," when to construe it as written would violate the constitution in the classification

of counties. This construction was made to avoid an unconstitutional result.

Many other cases, including *Neutzel* v. *Ryans,* 184 Ky. 292, 211 S.W. 852, where one ward was omitted from a Congressional reapportionment statute and it was held to have been intended by the legislature to be a part of it and so interpreted, have reached the same result; the important feature in all of these cases being that when the intention is ascertained the mere matter of rectifying a mistake by changing a word or phrase, or by deleting certain words or disregarding ambiguities, may be properly done if such intent of the legislature is manifest.

It not only appears to us that the General Assembly intended to use the word "township" instead of the word "village" for this omitted territory in the Fifth District, but this plainly appears from all of the facts prior to the enactment of the law. The intent may be carried into effect by the transposition of the words "township" and "village" in the description of the Fifth Congressional District, so as to not only properly describe the Fifth District, as intended by the legislature, but to completely apportion all the territory of the State. It would be absurd to impute to the legislature the intent to exclude some three miles square of territory, and thus invalidate an act upon which it has spent several months of time, having before it a map which included the territory in question within the Fifth District.

The other objections involve a claimed failure of lines to close the description of a district, or the failure to properly designate or describe the lines which separate two districts. In the Eleventh District the territory is described as consisting of certain wards, or portions within certain boundaries, and the description concludes "that part of the township of Norwood Park east of the center line of Canfield avenue in Cook County." And the description of the Thirteenth Congressional District, which is adjacent to the

west, after describing certain territory, concludes: "and that part of Norwood Park west of the center line of Canfield avenue, in Cook County, and Lake County." It is to be noticed that the description of one of the districts refers to the *township* of Norwood Park and the other to Norwood Park, and both refer to the center line of Canfield Avenue. As a matter of fact at this particular point there is no Canfield Avenue, but there is a Canfield Road. The designation of Canfield Avenue is used for that portion of such highway as lies within the city, and for the part which lies outside, the designation Canfield Road is used. One thing, however, appears clearly from the description of these two districts, and from the map used by the legislature, and that is, the west boundary of one district is the east boundary of the other, and, therefore, it must be a continuous line, however it may be described. It also appears from the plats introduced that the west line of Norwood Park and the west line of Norwood Township must be coincident, since both appear from the plat to be the boundary between the two districts. We will hereafter point out the principles of applying such descriptions to the territory involved.

The boundary between the Eight and Twelfth Districts is also questioned as being uncertain. The description of the Eighth District concludes: "That part of the Fortieth ward south of the channel of the north branch of the Chicago river at the point of juncture with the north shore channel of the Chicago Sanitary District;" whereas the last part of the description of the Twelfth District concludes: "that part of the Fortieth ward north of the channel of the north branch of the Chicago river at its juncture with the north shore channel of the Chicago Sanitary District." It will be noticed that these descriptions vary only in that one uses the "point of juncture" and the other "juncture," which it is contended makes the beginning point of the description uncertain, but it also specifies that the

Third District lies to the south of the river and the Twelfth District to that part north of the river. There is a juncture of the river with the north channel of the Chicago Sanitary District. We take judicial notice of the course of natural streams, (*Lowden* v. *Illinois Commerce Com.* 376 Ill. 225; 1 Jones on Evidence (Horvitz ed.) sec. 127,) and therefore know that the branch of the Chicago river at that point runs east and west, and is part of the south boundary of one district and a part of the north boundary of the other from the juncture of the sanitary district channel. As far as this particular objection is concerned we see no ambiguity whatsoever in the description which requires further comment.

The descriptions of the Sixth and Tenth Districts are questioned. The description of the Sixth District concludes: "and that part of the Thirty-seventh ward south of the center line of west Kinzie street, all in the City of Chicago; and the town of Cicero in Cook County." A portion of the description of the Tenth District reads: "that part of the Thirty-seventh ward north of the center line of west Kinzie street, all in the City of Chicago." The objection raised is that the Thirty-seventh Ward extends as far west as Austin Boulevard, whereas Kinzie Street does not reach Austin Boulevard as a laid-out, established street by several hundred feet, and therefore the claim is that all of the Thirty-seventh Ward from the end of Kinzie Street as far west as Austin Boulevard is not included, but only that part of the Thirty-seventh Ward which has a north boundary of Kinzie Street. However, Kinzie Street extended would close the gap.

The final objection on description is that of the Third and Fifth Districts. Among other things the description of the Third District contains the following: "that part of the Thirteenth ward south of the center line of west Sixty-fifth street;" while the Fifth District description, among other things, contains these words: "that part of the Thir-

teenth ward north of the center line of west Sixty-fifth street." West Sixty-fifth Street runs the entire length of the district along the line between these two districts, except for the space of a few hundred feet where the Belt Railroad intersects it at several feet above street level. For the distance of the width of this right of way there is no Sixty-fifth Street laid out or opened, and it is claimed that the absence of a street in this space prevents the boundaries of both the Third and Fifth Districts from closing.

The general rule pertaining to descriptions and boundaries is so well settled that it would seem unnecessary to cite specific authorities. In speaking of descriptions generally it is said in Thompson on Real Property, vol. 6, sec. 3415: "A proposed street, or one which does not exist in fact, may be used as a monument. Thus, where a street extends up to an unplatted and unsurveyed tract of land, but has not yet been extended into such tract, and a lot is sold, and its boundaries fixed by such street, just as if it had been extended into the tract, and there is no doubt as to just where the street when extended would be, the fixing of it as a boundary will control the courses and distances of the conveyance." So also it is stated in Devlin on Real Estate, vol. 2, sec. 1012: "And, generally, the rule may be stated to be that the deed will be sustained if it is possible from the whole description to ascertain and identify the land intended to be conveyed." This principle is supported by a multitude of authorities.

It is likewise well settled that the descriptions of municipal boundaries, or of counties, are not construed with the same strictness as those outlining boundaries in grants or contracts. (*Ross* v. *Mayor and Council of Borough of Edgewater*, 115 N.J.L. 477, 180 Atl. 866; *Shank* v. *Town of Ravenswood*, 43 W. Va. 242, 27 S.E. 223; *State ex rel. Budge* v. *Snyder*, 30 Wyo. 287, 219 Pac. 735; *Baker County* v. *Benson*, 40 Ore. 207, 66 Pac. 815.) While this rule was not stated in so many words, it is applied in the

case of *County of Perry* v. *County of Jefferson,* 94 Ill. 214.

With these principles in mind there can be no doubt whatsoever as to what was intended by the legislature in describing the boundaries of these several districts just above mentioned. The law is so well settled that boundaries give way to intention, when the intention can be known, that citation of authority for each specific misdescription enumerated above is unnecessary. In our opinion the act sufficiently describes the particular districts questioned by respondent.

Finally it is contended by respondent that the inequality in population among the several districts renders the act invalid. The theoretically perfect division would be to give each district a population of 303,740 upon the present population of the State. The constant fluctuations of populations due to economic reasons, diversity of population, war requirements, or other causes, render actual equality neither possible nor constant. It is a matter of discretion for the legislature in the exercise of its judgment to take into consideration present conditions, and probable changes likely to occur before another census, in fixing the boundaries of Congressional Districts.

Reliance is placed upon *Moran* v. *Bowley,* 347 Ill. 148, which held the Reapportionment Act of 1931 invalid because of the disparity of population in several of its districts. This result was based almost entirely upon requirements of the act of Congress of 1911 (U.S.C.A. Title 2, sec. 3,) relating to the census, which the court construed as requiring equality of population in all congressional districts. Later the Supreme Court of the United States in *Wood* v. *Broom,* 287 U.S. 1, 77 L. ed. 131, held the provisions of the act of Congress of 1911 expired of its own limitation when it was followed by the Census Act of 1929, which did not contain the same language as the act of 1911, and which had no population requirement whatsoever. The *Wood* case also held that there was nothing in the

fourteenth amendment which would render invalid districts which were unequal in population.

The case of *Daly* v. *County of Madison,* 378 Ill. 357, calls attention to the fact that the decision of the Supreme Court in the *Wood case* cuts the ground from under the *Moran case,* and comments: "It follows that unless some such restrictions or limitations are found in our own constitution, the legislature is free to create districts without reference to equality in population." Our attention has been called to no such restrictions, nor do we find note of any. In addition, when taking into consideration that the districts must be spread over fifty thousand square miles of territory, which contains within its boundaries a city of, close to four million people and still expanding, it seems to us that the division was as fair and equal as the circumstances of such a vast territory, with different densities of population, would permit.

The constitution provides each of the three departments of government are distinct, and that no one in these several departments shall exercise any power properly belonging to either of the others. (Article III.) It is the province of the legislature to enact the laws, and that of the courts to construe them. In this instance the legislature has enacted a law. Its intents and purposes are clear. Should we undertake to say it intended to omit territory, in the face of a manifest intent to the contrary, we would invade its province. The errors called to our attention are subject to a construction and interpretation which uphold the law, *(People ex rel. Auburn Coal and Material Co.* v. *Hughes,* 357 Ill. 524,) and, construed as above, the law is a valid enactment.

*Writ awarded.*