CHRYSLER CREDIT CORPORATION, Plaintiff-Appellant, *v.* BILLY J. Ross, Defendant-Appellee.

(No. 59696;

First District (2nd Division)—April 22, 1975.

Norman P. Wexler, of Wexler, Wexler and Heller, Ltd., of Chicago, for appellant.

Paul Beard, of Chicago, for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This is the appeal of an installment contract assignee who after collecting 60% of the deferred price sued the motor vehicle installment buyer to recover a deficiency judgment. In defense of the suit, the buyer invoked section 20 of the Motor Vehicle Retail Installment Sales Act. Without a jury, the trial court sustained the defense. The issue before us is whether, within the words of the statute, a motor vehicle which is stolen, damaged by persons other than the buyer and then surrendered to the assignee of the seller, after 60% of the deferred price has been paid, is "* * * in ordinary condition and free from malicious damage * * *." The case is before us on an agreed statement of facts.

It appears from this statement that on October 8, 1970, Billy J. Ross entered into a retail installment contract by which he agreed to buy a 1971 Dodge sedan for a deferred payment price of $6152.80, payable in 36 consecutive monthly installments of $138.70. On the same day the contract was assigned to Chrysler Credit Corporation, the plaintiff in this case. Under the contract terms, Ross agreed to maintain the Dodge in good repair and "* * * keep [it] insured as [his] expense against substantial risk of damage, destruction, or loss for so long as any amount remains unpaid on this contract, with loss payable to the seller as its interest may appear * * *." Ross agreed that as proof of having obtained the required insurance coverage, he would, on its receipt, deliver the insurance policy to the seller or any assignee of the contract. The contract further provided that the seller could, at Ross' expense, "* * * but shall not be required to, and without prejudice to [its] rights under this contract if it does not, procure such vehicle insurance protecting (i) interest of [Ross and the seller] or (ii) interest of seller only, if [Ross] fails to procure or maintain such vehicle insurance or fails to furnish satisfactory evidence thereof upon request."

The contract was performed to the satisfaction of both parties until May 31, 1972, when Ross' motor vehicle was stolen. With that event, he stopped paying the installments. A short time later, the vehicle was recovered, damaged by the person or persons who had stolen it. Then, without legal proceedings, Ross surrendered the Dodge to Chrysler

Credit after having paid more than 60% of the deferred payment price.

At the time, section 20 of the Motor Vehicle Retail Installment Sales Act provided that "[u]pon default by the buyer under a retail installment contract the parties have the rights and remedies provided in Article 9 of the Uniform Commercial Code. If the buyer has paid an amount equal to 60% or more of the deferred payment price at the time of his default under the contract and if the buyer, at the request of the holder and without legal proceedings, surrenders the goods to the holder in ordinary condition and free from malicious damage, the holder must, within 5 days from the date of receipt of the goods at his place of business, elect either (a) to retain the goods and release the buyer from further obligation under the contract, or (b) to return the goods to the buyer at the holder's expense and be limited to an action to recover the balance of the indebtedness." Ill. Rev. Stat. 1969, ch. 121½, par. 580.

Chrysler Credit did not make either of these elections. Instead, pursuant to notice, it sold the surrendered vehicle at public auction for $839. Then, after crediting certain unearned charges, it determined that there was a deficiency totalling $1368.57 and sued Ross for this sum. He defended the suit by relying on the provisions of section 20. He argued that he had paid more than 60% of the deferred price; and although the vehicle was damaged by others, he had surrendered it without legal proceedings and free from malicious damage. Under these circumstances, Ross insisted, Chrysler Credit had to make one of the elections required by the statute but did not. Therefore, it could not recover any deficiency judgment. The trial court agreed with Ross and entered judgment in his favor.

In this court, Chrysler Credit contends that entering the judgment in Ross' favor was error. It argues that Ross was under a contractual obligation to keep his motor vehicle in good repair but surrendered it in a damaged condition, even though the damage was caused by other persons. Therefore, it is argued, section 20 was not available to him as a defense to the suit.

Ross meets this contention with the argument that he was protected by section 20 because he had paid more than 60% of the deferred price and had surrendered his vehicle free from malicious damage. Therefore, he insists, Chrysler Credit had to make one of the two elections required by the statute. It did not, however. For this reason, Ross concludes that his creditor could not recover a deficiency judgment against him. The contentions and arguments of the parties require us to construe section 20 and determine the intent of the Legislature when it afforded protection of the statute to an installment buyer who had paid 60% or

more of the deferred price and who surrendered an installment purchased motor vehicle "* * * in ordinary condition and free from malicious damage * * *."

██ In construing a statute, the primary concern is determination of the legislative intent behind its enactment. (*People ex rel. Moss v. Pate,* 30 Ill.2d 271, 273, 195 N.E.2d 641.) To determine, as to a given statute, what was the legislative intent, a court may look not only at the language employed in the legislation, but also the reason and necessity for the law, the evils to be remedied, and the object and purpose which the legislature sought to obtain. (*Mid-South Chemical Corp. v. Carpentier,* 14 Ill.2d 514, 517, 153 N.E.2d 72.) To this end, consideration of legislative history is always proper; and this would include, of course, the occasion or necessity for the law, its previous condition concerning the subject and the defects in it which the legislature intended to remedy. (*People ex rel. Cason v. Ring,* 41 Ill.2d 305, 242 N.E.2d 267.) And in this task, a court will take into account such existing circumstances or contemporary conditions as may prevail at the time the law was adopted. *Petterson v. City of Naperville,* 9 Ill.2d 233, 137 N.E.2d 371; see *Barrett v. Chicago Transit Authority,* 348 Ill.App. 83, 107 N.E.2d 859.

Accordingly, we take into account the fact that "growth of the credit economy has been inevitably accompanied by a substantial growth of unscrupulous practices designed to prey upon the necessitous or unsophisticated consumer, and such practices have, in turn, produced renewed interest in various regulatory schemes designed to protect the consumer against himself and others." (See Annot., 14 A.L.R.3d 330, 333-334 (1967).) This renewed interest became increasingly apparent during the late 1950's and early 1960's in legislatures throughout the United States with the result that statutes were adopted as credit regulations whose purpose was the protection of consumers from fraud, deception, oppressive credit installment terms and similar unscrupulous practices. (See Note, *Enforcement of Consumer Credit Regulations,* 55 Nw. U.L. Rev. 403 (1960).) One class of consumers thus protected were those who purchased goods under the terms of retail installment contracts. And in Illinois, the statute adopted was the Retail Installment Sales Act, passed in 1957, and which became effective January 1, 1958. See Ill. Rev. Stat. 1957, ch. 121½, pars. 223-53; Britton and Ulrich, *The Illinois Retail Installment Sales Act—Historical Background and Comparative Legislation,* 53 Nw. U. L. Rev. 137 (1958); Hubachek, *The Drift Toward a Consumer Credit Code,* 16 U. Chi. L. Rev. 609 (1949).

This statute, when it was adopted, was considered by many to be an Illinois legislative breakthrough. Early in its existence, however, its potential for ineffectiveness was noticed. (See Nichols, *Caveat Vendor? The*

*Illinois Retail Installment Sales Act,* 46 Ill. Bar Jour. 658, 660 (1958).) Later in its history, its defects were the subject of comment by those who follow developments in our law of contracts. (See Benett, *Contracts-Sales,* 22 DePaul L. Rev. 156, 170 (1972).) For one thing, the coverage of the statute was broad; it included all goods purchased for personal or family use. "Goods," under the statute, meant "any tangible personal property." (Ill. Rev. Stat. 1957, ch. 121½, par. 223.) Therefore, it included the installment purchase of a motor vehicle. See *First National Bank v. Husted,* 57 Ill.App.2d 227, 205 N.E.2d 780.

More importantly, this statute codified, indeed it reinforced, existing Illinois law by providing that on default of the buyer, the installment seller could retake the goods and sell them at public or private sale. (Ill. Rev. Stat. 1957, ch. 121½, par. 247.) This was repossession which, with notice, the seller could accomplish by self-help. (Ill. Rev. Stat. 1957, ch. 121½, par. 245.) The right to repossess goods sold under an installment contract is an ancient one. (See McCall, *The Past as Prologue: A History of the Right to Repossess,* 47 S. Cal. L. Rev. 58 (1973).) It was recognized in the common law of England (2 W. Blackstone Commentaries 1490n.2 (Jones ed. 1916); F. Pollock & F. Maitland, The History of English Law 574. (2d ed. 1903), and it was enacted in Illinois law when the Retail Installment Sales Act was adopted (Ill. Rev. Stat. 1957. ch. 121½, par. 245). Repossession and resale of the goods meant that proceeds of the resale could be applied by the seller first to payment of repossession and resale expenses; second, to the expenses incurred in keeping and storing the repossessed goods, including reasonable attorneys fees; and then, the balance was to be applied to the debt due under the installment contract. (Ill. Rev. Stat. 1957, ch. 121½, par. 248.) The statute further provided that "[i]f the proceeds of the resale are not sufficient to defray the expenses thereof, and also the expenses of retaking, keeping and storing the goods to which the holder may be entitled and the balance due upon the purchase price, the holder may recover the deficiency from the buyer, or from any one who has succeeded to the obligations of the buyer." Ill. Rev. Stat. 1957, ch. 121½, par. 249.

These provisions did not have statutory antecedents in Illinois law. (See Ill. Rev. Stat. 1955, ch. 121½, pars. 1—222.) Their purpose, however, as is generally the purpose of credit reform legislation, was equalization of the relation between the installment seller and his buyer; it was to protect the buyer from the myriad of oppressive practices which, under the best of circumstances, seems to characterize installment selling. (See Alexander, *Fraudulent Installment Sales in Chicago,* 41 Chicago Bar Rec. 285 (1960); Note, *Protecting the Installment Buyer,* 49 Harv. L. Rev. 128 (1935); Donaldson, *An Analysis of Retail Installment Sales*

*Legislation,* 19 Rocky Mt. L. Rev. 135 (1947); Hogan, *A Survey of State Retail Installment Sales Legislation,* 44 Cornell L. Q. 38 (1958).) But the Illinois retail installment sales statute contained features that were anomalous to the usual objectives of such laws. For example, the reasonableness of repossession and resale expenses, those for the keeping and storing of repossessed goods, and the reasonable value of the goods at the time of resale, were to be determined "* * * in any action or proceeding brought by the [seller] to recover deficiency, the resale price being prima facie but not conclusive evidence of such reasonable value." (Ill. Rev. Stat. 1957, ch. 121½, par. 249.) With such provisions, it is not surprising, therefore, that the 1957 Retail Installment Sales Act, jarred by the social and economic realities of installment transactions, proved ineffective where the buyer was concerned, particularly one who purchased a motor vehicle on an installment contract.

This experience is perhaps explained by the fact that the motor vehicle is important in the life of the average American wage earner. Next to the money he spends on housing, his largest single investment is made when he buys the family car. And most likely, he will buy it on credit, payable in installments. This is true of millions of American wage earners. In fact, automobile installment sales account for the largest segment of installment credit in this country. See 15 Ency. Amer., Installment Buying and Selling 169 (1968); U.S. Dept. of Commerce Business Statistics 93 (1973 ed.).

Moreover, installment credit in the sale of a motor vehicle differs from that involving any other kind of personal property ordinarily purchased for family use. The price is usually large; the installments are spread over a longer period; interest payments and finance charges are substantial; and the consequences of repossession, resale and deficiency judgment are greater to the average family. It is not surprising, therefore, that after adoption of the 1957 Retail Installment Sales Act, and until the mid-1960's, public attention and legislative interest were drawn to the subject of installment transactions involving vehicles. This attention and interest were heightened early in 1966 by a series of dramatic events that erupted in the city of Chicago.

The first of these occurred in the afternoon of January 8 when an enraged buyer of a motor vehicle went to a well-known automobile sales agency to dispute the terms of his installment contract. Armed with two guns, he shot and killed three men, two of them the co-owners of the agency. He used a woman employee as a shield, terrorized the establishment, and ultimately was shot and killed by a Chicago policeman. A few days later, a spokesman for the agency issued a statement which sought to explain the terms of the installment sale that had led to the tragedy.

Two months later, in a different section of the city, a 21-year-old install-ment buyer of an automobile went to the offices of the company that financed his purchase and, armed with a shotgun, terrorized more than 50 people over a dispute concerning the terms of his installment contract. The motor vehicle he had purchased was stolen, later recovered and then repossessed by the company. The vehicle was sold twice; and thereafter, the company obtained a deficiency judgment against the enraged cus-tomer, which it was trying to enforce by garnishment of wages.[1]

These incidents, repeated in less dramatic ways in other parts of the State, spurred action among members of the General Assembly. Legisla-tive committees conducted hearings throughout the State. One well-known member of the Assembly's lower house later observed that "* * * these problems became so overpowering in their omnipresence and so much in the public eye, [that] the time to 'do something' finally arrived. Scandals and tragedies became almost everyday occurrences—people committing suicide because of credit problems, people going berserk and killing their creditors because of credit problems, people quitting and being fired because of credit problems. All of these events began to build up pressure for reform." (Mikva, *Future Trends in Consumer Credit,* 52 Chicago Bar Rec. 355, 357 (1971).) Therefore, when the General Assembly met for its 1967 session, it had before it "* * * a series of 11 bills designed to protect the consumer by putting the credit industry under strict regulation."[2] These bills came to be known as the "credit reform package," legislative proposals whose purpose was protection of those who bought goods on credit, particularly the installment buyer. (See Rock, *Credit Reform in Illinois—The Age of Consumerism,* 49 Chi-cago Bar Rec. 91 (1967).) Several of these proposals became law. One was the entirely revised retail installment sales act which by its terms covered goods and services but excluded motor vehicles. The other was "[a]n Act relating to and regulating retail installment sales of motor vehicles and providing penalties for the violation thereof." Ill. Rev. Stat. 1967, ch. 121½, pars. 561 *et seq.*

This statute was to be known as the Motor Vehicle Retail Installment Sales Act. It was new in the law of Illinois. A series of initial subsections defined its scope and coverage. (Ill. Rev. Stat. 1967, ch. 121½, pars. 562.1—562.12.) Separate sections dealt with the details of a motor vehicle installment sale. These sections paralleled the Retail Installment Sales Act, its companion statute. On default of the buyer, the rights of the

---

[1] Chicago Tribune, Jan. 8, 1966, § 1, at 1, col. 7; Id., Feb. 3, 1966, § 1A, at 1, col. 1; Id., Mar. 9, 1966, § 1, at 17, col. 2.

[2] Chicago Tribune, Dec. 9, 1966, § 1, at 3, col. 1.

parties were governed by article 9 of the Uniform Commercial Code. (See Ill. Rev. Stat. 1967, ch. 121½, par. 580.) Thus, two statutes related to the same subject matter. The attorney general or the State's attorney of any county could sue in the name of the State to restrain any act or practice deemed in violation of the statute. (Ill. Rev. Stat. 1967, ch. 121½, par. 583.) Violations of the Act were misdemeanors. And "[n]o person who violates this Act, except as a result of an accident or bone fide error of computation may recover any time price differential, any delinquency or collection charge or any refinance charge in connection with the related retail installment contract." Ill. Rev. Stat. 1967, ch. 121½, par. 584.

■■ In construing any portion of a statute, it is the language of the whole that is read, not words of a section of a provision in isolation; courts will construe the details of an enactment in conformity with its dominating general purpose. (*People ex rel. Barrett v. Anderson*, 398 Ill. 480, 485, 76 N.E.2d 773; see *S. Bloom, Inc. v. Korshak*, 52 Ill.2d 56, 284 N.E.2d 257; compare *People v. Suddoth*, 52 Ill.App.2d 355, 202 N.E. 2d 120.) And statutes that relate to the same subject, those in pari materia, are considered together as one, even though they are enacted at different times. (See *Spring Hill Cemetery v. Ryan*, 20 Ill.2d 608, 170 N.E.2d 619; I.L.P. *Statutes* § 131.) Therefore, with these rules in mind, we read section 20 and notice that by article 9 of the Uniform Commercial Code, its modifies, in fact changes in many respects, the powers of the installment seller to repossess, resell and obtain a deficiency judgment against the installment buyer of a motor vehicle. (See Ill. Rev. Stat. 1965, ch. 121½, par. 249; compare Ill. Rev. Stat. 1967, ch. 121½, par. 580; Ill. Rev. Stat. 1965, ch. 26, pars. 9—501 *et seq.*) Obviously, this result was intended as a protection for the buyer. Looking at other parts of the Act, we see that the legislature recognized casualty insurance as a necessity in the installment sale of a motor vehicle. It provided that "[a] seller under a retail installment contract may require insurance against substantial risk of loss of or damage to the motor vehicle, protecting the seller or holder as well as the buyer, and may, if the buyer elects, include therefor in the contract an amount not exceeding the premiums chargeable for such insurance in accordance with rate filings made with the Director of Insurance." (Ill. Rev. Stat. 1967, ch. 121½, par. 568.) The buyer was required to furnish the seller with evidence that he had procured such insurance. "If the buyer fails to furnish such evidence, the holder may purchase such insurance, charge the premium therefor to buyer, and prorate the cost of the insurance over the remaining scheduled time payments." Ill. Rev. Stat. 1967, ch. 121½, par. 568.

■■ In our judgment, these provisions bear on the meaning of section 20. They show that in using the language employed, the legislature

considered what is comon knowledge: damage to a motor vehicle is an ordinary occurrence. Therefore, it provided that the seller should be protected against such ordinary occurrences by insurance at the buyer's expense. Then, affecting only a definable segment of those who buy an automobile on credit, the legislature provided, in section 20, that if the buyer, after paying 60% or more of the deferred price, surrenders the vehicle without legal proceedings "* * * in ordinary condition and free from malicious damage * * *," the seller or assignee must make one of two elections: (1) retain the vehicle and release the buyer or (2) return it to the buyer and be limited to an action to recover the balance of the indebtedness. (Ill. Rev. Stat. 1967, ch. 121½, par. 580.) We construe this section to mean that when a motor vehicle installment buyer has paid more than 60% of the deferred price and without legal proceedings surrenders it to the seller or assignee, although in a condition of damage caused by others but free from damage maliciously caused by him, that vehicle is "* * * in ordinary condition and free from malicious damage." These provisions, consistent with the Act as a whole, were designed to protect the qualifying buyer from a deficiency judgment. (Compare *Chicago City Bank and Trust Company v. Anderson,* 26 Ill. App.3d 421, 325 N.E.2d 701.) Therefore, when a motor vehicle installment buyer who has paid 60% or more of the deferred price surrenders the vehicle without legal proceedings in a condition free from malicious damage caused by him but damaged by others, the seller or assignee must make one of the elections set out in section 20. If this is not done, no action against the buyer for a deficiency judgment will lie. In this case, Ross, without legal proceedings, surrendered his Dodge to Chrysler Credit after he had paid 60% or more of the deferred price. It was damaged, but the damage was caused by others. Chrysler Credit did not make either election required by the statute; it kept the vehicle and sold it. Under such circumstances, Chrysler Credit could not sue Ross to recover what it claimed was a deficiency. For these reasons, the judgment is affirmed.

Affirmed.

DOWNING, P. J., and HAYES, J., concur.