(No. 21951.—

DAVID P. BURNS, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(FRANCES L. LEACH, Defendant in Error.)

*Opinion filed June 15, 1934.*

WILLIAM GREENE, H. L. HOWARD, and CLARENCE W. HEYL, for plaintiff in error.

HENRY KNELLER, GEORGE W. HUNT, and REN THURMAN, for defendant in error.

Mr. JUSTICE SHAW delivered the opinion of the court:

The defendant in error, Frances L. Leach, filed her application with the Industrial Commission seeking compensation on account of the death of her husband, Henry P. Leach, while employed by David P. Burns. In that application she alleged her deceased husband had suffered an injury arising out of and in the course of his employment through the inhalation of fumes from poisonous chemicals, which was said to have caused his death. The arbitrator and the Industrial Commission granted her an award of $3750 together with $225 for medical and hospital services, which award was confirmed by the circuit court of Peoria county on *certiorari*. A petition for writ of error was allowed in this court, and the case is here for review thereon.

David P. Burns, under the name of Burns Glass Company, was engaged in business in the city of Peoria, in which business, among other things, he re-silvered mirrors. This work was carried on in a factory having work-rooms and a warehouse, and the deceased performed therein various duties, at times working in what was called the silvering room. This room was eighteen feet wide and thirty feet long, equipped with a steam table with four burners, which stood in the center of the room, and in which room a washing-rack was at one end and a painting-rack at the

other. A solution of lye was ordinarily used to remove paint and slack from mirrors, and where the lye treatment was not successful nitric or muriatic acid was used. In those cases the mirror was ordinarily immersed in a solution of muriatic acid diluted with water, and in some cases, where old silver was to be removed, the use of nitric acid became necessary, it being applied with a swab on the end of a stick. The deceased had assisted in these processes at different times.

The defendant in error, Frances L. Leach, testified that the deceased had a sore throat in January of 1930, and it became red and inflamed, but that he did not consult a physician until some time in July; that after July 18 he was unable to work, and that the ailment continued and his rest was impaired. Various other symptoms were described by her and she testified that he died on August 9, 1930. The only medical testimony offered was that of Dr. J. P. Jennings, who visited the deceased frequently between July 18 and August 9, and whose testimony was to the effect that the direct cause of death was acute dilation of the heart, with sclerosis of the lungs and bronchial tubes as a contributing cause. In answer to a hypothetical question, which we will discuss later, Dr. Jennings expressed the opinion that the inhalation of fumes emanating from nitric and muriatic acids caused an irritation and inflammation of Leach's throat and lungs and indirectly the weakened condition of his system.

The claim presented for our consideration is in part dependent for its determination upon a construction of section 2 of the Occupational Diseases act. (Cahill's Stat. 1933, p. 1375; Smith's Stat. 1933, p. 1401.) This section, in which we have inserted one word in parenthesis for convenience and brevity, is as follows: "Every employer in this State engaged in the carrying on of any process of manufacture or labor in which sugar of lead, white lead, lead chromate, litharge, red lead, arsenate of

lead, or paris green are employed, used or handled, or the manufacture of brass or the smelting of lead or zinc which processes and employments are hereby declared to be especially dangerous to the health of the employees (*or*) engaged in any process of manufacture or labor in which poisonous chemicals, minerals or other substances are used or handled by the employees therein in harmful quantities or under harmful conditions, shall provide for and place at the disposal of the employees engaged in any such process or manufacture and shall maintain in good condition and without cost to the employees, proper working clothing to be kept and used exclusively for such employees while at work, and all employees therein shall be required at all times while they are at work to use and wear such clothing; and in all processes of manufacture or labor referred to in this section which are unnecessarily productive of noxious or poisonous dusts, adequate and approved respirators shall be furnished and maintained by the employer in good condition and without cost to the employees, and such employees shall use such respirators at all times while engaged in any work necessarily productive of noxious or poisonous dusts."

The plaintiff in error contends that the occupation of the deceased was not one of those intended to be covered by section 2; that there is no allegation or proof showing that the chemicals complained of were used and handled in harmful quantities or under harmful conditions; that there is no competent evidence in the record showing that the deceased came to his death as the result of his occupation and that there is no causal connection between the two; and the award is against the manifest weight of the evidence, and that that part of section 2 under which the award was supposedly made is unconstitutional because of its being uncertain, unintelligible and so indefinite as to be unenforceable. We will consider first the proper construction and intended meaning of section 2.

The primary purpose of statutory construction is to arrive at the legislative intent. (*People* v. *Talbot,* 322 Ill. 416.) In order to arrive at this intent the several provisions of the statute are to be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and plan thereof as therein expressed. (*Public Utilities Com.* v. *Monarch Co.* 267 Ill. 528.) If this intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such legislative intention. *Public Utilities Com.* v. *Monarch Co. supra; Krome* v. *Halbert,* 263 Ill. 172; *Hoyne* v. *Danisch,* 264 id. 467; *People* v. *Merchants Trust Co.* 328 id. 223; *People* v. *McEldowney,* 308 id. 575; *Smith* v. *Logan County,* 284 id. 163; *People* v. *Fox,* 269 id. 300; *People* v. *Flynn,* 269 id. 414.

In enacting section 2 of the Occupational Diseases act the legislature evidently intended to establish either two or three classes of occupations to which it would apply. If the word "or" is read into section 2 of the act between the words "employees" and "engaged," as we have above indicated in parenthesis and italics, then three distinct classes are created, as follows: (1) Those who are engaged in an industry using lead derivatives or paris green; (2) the manufacture of brass or the smelting of lead or zinc; and (3) any process of manufacture in which poisonous chemicals, minerals or other substances are used or handled in harmful quantities or under harmful conditions. If we omit the word "or" we find that after the statute creates the first two classes it contains a jumble of words which could not have been written into it for any legislative purpose whatever. We have thus our choice between, on the one hand, assuming that the word "or" was inadvertently omitted, or, on the other hand, assuming that the legislature intended to write approximately thirty-one words into the act without any purpose

in view at all. Our problem, thus stated, is, Did the legislature inadvertently omit one word which would clarify the entire section if supplied, or did it intentionally include thirty-one words which are entirely useless without the conjunction? Recurring to our primary rule as above stated, that it is our purpose to discover the legislative intent, we feel it more reasonable to assume that the word "or" was inadvertently omitted and should be supplied. Thus correctly construed the entire section is intelligible, whereas any other construction would render approximately one-third of it meaningless.

Subdivision (b)1 of section 15 provides that if the employee's disability or death is caused by an occupational disease as defined in the act, arising out of and in the course of his employment in one of the occupations referred to in section 2 of the act, he shall be entitled to compensation in the manner provided by the Workmen's Compensation act. We have therefore to determine whether or not the record before us will sustain an award upon this theory, as was held by the Industrial Commission and the circuit court. To determine this point it will be necessary to review the evidence.

In addition to the facts previously stated, it appears from the record that the business of the Burns Glass Company consists of furnishing and supplying all kinds of glasswork, including large plate-glass fronts for buildings. The silvering of mirrors, in which the acids were used, was carried on in a small room in the corner of the main plant. The nitric acid which was occasionally used was kept in one-gallon jars and the muriatic acid was kept in a tank. This tank was about a foot wide, about six feet long and about four feet deep. In it were placed from forty to forty-eight gallons of muriatic acid and the rest of its contents was water. When the old silver was removed from the mirrors by the immersion process the glass was placed in this tank and left there until the silver was removed by

the action of the acid. When this would not remove it the silver was sometimes removed by swabbing with nitric acid. The muriatic acid tank was not in the silvering room but out in the warehouse. It appears that the deceased at times worked in the silvering room, and that one witness had seen him handling the nitric acid and immersing the mirrors in muriatic acid. There is no evidence that any noxious or poisonous fumes were produced by any of these processes.

The defendant in error, wife of the deceased, testified that Leach had started to have sore throat about New Year's day and that it was continuous up to the time of his death, in August; that he did not have a doctor, but used gargles, sprays, etc., until July, at which time the doctor commenced to see him regularly and continued to do so until his death. This is the substance of all of the material evidence except that of the physician.

Dr. Jennings testified that he was called to see Leach between the fifth and tenth of July and that he only examined his throat; that Leach was at that time coughing and complained of an irritation of his throat, was weak and had difficulty in swallowing. He also complained of being hungry and not being able to take nourishment. The doctor said that the mucous membrane of the throat was red and congested and secreted a mucoid substance, indicating an inflammation; that the throat affliction prevented the patient from swallowing or taking nourishment; that by reason thereof his physical condition became constantly weaker; that he prescribed a soft diet, with liquid foods, and that he saw him every day until the 18th of July and from then on two or three times a day until he died, on August 9; that the usual charges were three dollars for a day call and five dollars for a night call, and that he estimated his bill ought to be about $225. There was no evidence of any hospital treatment or of any effort to nourish the deceased by any other means of feeding than through

the mouth. It was the doctor's opinion that death resulted from acute dilation of the heart as a primary cause, with sclerosis of the lungs and bronchial tubes contributing. The only objective symptoms testified to by the doctor were the redness of the throat, the emaciation of the patient, his loss of weight and the mucous secretion. He did no post-mortem, and testified that his determination of sclerosis of the lung was entirely from an external physical examination.

With the record as above stated, Dr. Jennings was permitted to answer a long, involved and complicated hypothetical question as to the cause of death, which it is unnecessary to set forth at length. He stated that in his opinion the acid fumes which the man breathed caused it. He went on to explain by saying that acids, such as nitric and muriatic, gave off fumes, and that these fumes came upon the mucous membrane and tissues, causing the irritation and inflammation, with secretions, which produced congestion and inflammation; that in this case there was caused an acid condition of the blood stream, because, as he said, the acids had a definite chemical action on the albumin and on the nervous system, and it caused a chemical change in the mineral substance circulating in the blood and a definite effect upon the muscles, nervous system, kidneys and liver cells; that in his opinion, based upon the hypothetical question and upon a reasonable medical certainty, changes took place due to the inhalation of the fumes. On cross-examination he testified that he had been in general practice since 1916, did not specialize in eye, ear, nose or throat ailments, and had never seen a case similar to this one; that the only chemistry he had ever studied was general chemistry in connection with his medical course; that there is a dilute and a stronger muriatic acid; that he did not know the component parts of muriatic acid; that when he answered the hypothetical question he had in mind the kind of muriatic acid that gives off fumes and that as to the nitric acid he had in mind the commer-

cial acid. He also testified that in answering the hypothetical question he did not have to know how strong or how weak the solution of muriatic acid was. He further admitted on cross-examination that in order for fumes to come off of an acid it would have to be a strong acid, and that when he answered the hypothetical question he assumed that the nitric acid was a strong acid. On re-direct examination he testified that nitric acid is a "mineral" acid.

The Century Dictionary defines muriatic acid as "the commercial name of hydrochloric acid." Hydrochloric acid is defined as "HCL, a colorless gas having a suffocating odor and acid taste. It is irrespirable and not a supporter of combustion. It is extremely soluble in water, and its solution forms the hydrochloric acid or muriatic acid of all commerce. It is one of the most important acids commercially and is made as a by-product of the soda-ash manufacture." Nitric acid is defined as "$HNO_3$, an acid prepared by distilling a mixture of sulphuric acid and sodium nitrate. * * * When pure it is a colorless liquid, but is usually yellowish, owing to a small admixture of oxide of nitrogen. Its smell is very strong and disagreeable and it is intensely acrid."

A computation from the record would indicate that the tank in which the muriatic acid was used had a capacity of approximately 180 gallons. Into this tank were emptied four carboys, containing ten or twelve gallons each, of muriatic acid, and the rest of the contents was water. We thus have several unknown factors necessary to a determination of the strength of the muriatic acid. We do not know how much pure hydrochloric acid was dissolved in the water to make the commercial muriatic acid and neither do we know the exact amount of either the muriatic acid or water put into the tank. It would appear to be about a twenty-five or thirty per cent solution, but having arrived at this point we are, as the doctor answering the hypothetical question was, without any information from which

it could be determined whether or not anything harmful could have been breathed by the deceased at his work. The same is true as to the nitric acid, and there is no evidence in the record, or other information available to us, indicating that either of these acids would give off fumes unless they were actively applied to some metal upon which they could act. Neither was the doctor, nor are we, advised as to the character of the gases or fumes which might be generated through such a reaction. There was no evidence sufficient as a foundation for the hypothetical question upon which the entire case is built, and without that evidence the entire case must fail. In the absence of proof establishing a causal relationship between the handling of the acids and the disease from which it is alleged the deceased died, the judgment must be reversed. *Rittler* v. *Industrial Com.* 351 Ill. 338; *Freeman Coal Co.* v. *Industrial Com.* 315 id. 84; *Sanitary District* v. *Industrial Com.* 343 id. 236; *Hahn* v. *Industrial Com.* 337 id. 59.

Since this case must be remanded, it is necessary to point out another failure of proof. Subdivision (*b*)2 of section 15 of the act defines the words "occupational disease" as "a disease peculiar to and due to the nature of an employment in one or more of the occupations referred to in section 2 of this act." The word "occupations" is defined as including "each and every process, manufacture, employment, and process of manufacture or labor referred to in section 2 of this act." Construing all of these provisions together, it is apparent that before a recovery can be had it must be proved that the cause of death was a disease "peculiar to and due to" the employment in which Leach was engaged.

The judgment of the circuit court is reversed and the cause is remanded to that court, with directions to remand the cause to the Industrial Commission for further testimony, if the parties shall be so advised.

*Reversed and remanded, with directions.*