(No. 41719.—

THE PEOPLE *ex rel.* Raymond Cason, *et al.,* Petitioners, *vs.* DANIEL RING, County Clerk, Respondent.

*Announced October 28, 1968.—Opinion filed November 22, 1968.*

306

James W. McRoberts, Jr. and Robert S. Kaucher, both of East St. Louis, for petitioners.

John M. Karns, Jr., State's Attorney, and Eugene H. Widman, Assistant State's Attorney, both of Belleville, for respondent.

Mr. Justice Underwood delivered the opinion of the court:

This is an original *mandamus* proceeding brought by petitioners who are residents of Centreville Township and Stites Township in St. Clair County seeking to compel respondent Daniel Ring, county clerk of St. Clair County, to conduct hearings pursuant to the provisions of sections 4—12 and 4—13 of the Election Code upon numerous applications to erase from the register of voters the names of allegedly unqualified voters. Because of the imminence of the November 5 election we issued the writ of *mandamus* on October 28, indicating that an opinion setting forth the reasons for issuance would be filed later. This is that opinion.

Under the Election Code the county clerk is the county officer in charge of the registration of voters within each county outside the jurisdiction of cities having election commissions. (Ill. Rev. Stat. 1967, chap. 46, par. 4—4.) It is his statutory duty to examine the records of deaths in the county each month and to cancel the registration of any voter who has died during the preceding month (Ill. Rev. Stat. 1967, chap. 46, par. 4—14.1); to record, after notification, changes of address and names of voters in the county and to erase from the register of voters the names of those no longer qualified to vote. Ill. Rev. Stat. 1967, chap. 46, par. 4—16.

Since the adoption in 1943 of sections 4—12 and 4—13 of the Election Code there has been a statutorily prescribed method by which voters may apply to the county clerk for the erasure of names of unqualified voters from the register. Prior to the 1967 amendments to those sections applications to erase had to be made between the hours of 9:00 A.M. and 5:00 P.M. on the Monday and Tuesday of the second week prior to the week in which "any" election was to be held. Upon receipt of such application it was the duty of the clerk to give the prescribed notice to the challenged voters that a hearing was to be held thereon, demanding that they appear before him to show cause why

their names should not be erased from the register. Section 4—13 provided that the clerk should sit to hear applications for erasure on Thursday, Friday and Saturday of that same week, and that he should announce his decision at once after the hearing. The applicant for erasure or the challenged voter has the right to appeal an adverse decision to the judge of the circuit court, who might, at his discretion, hear the appeals on the same days as the hearings which occur before the county clerk. Although the petitioners filed applications for the erasure of many allegedly unqualified voters from the register in St. Clair County, the respondent clerk has refused to conduct hearings thereon. His refusal is predicated on the theory that the 1967 amendments to sections 4—12 and 4—13 of the Election Code do not require him to conduct such hearings for the 1968 election year but only for the election year of 1970 and years thereafter. The issue before us is one of statutory construction to determine whether the 1967 amendments to sections 4—12 and 4—13 of the Election Code were intended to deprive the citizenry in 1968 of their right prior to election day to challenge unqualified voters in any precinct in the "township, city, village or unincorporated town" in which the challengers reside.

As originally adopted in 1943, the pertinent sentence of section 4—12 read as follows: "Any voter or voters in the township, city, village or incorporated town containing such precinct may, between the hours of nine o'clock a.m. and five o'clock p.m. of Monday and Tuesday of the second week prior to the week in which any election is to be held, make application in writing, to the county clerk, to have any name upon the register of any precinct erased." After the 1967 amendments, which were contained in House Bill No. 473, this sentence of section 4—12 read as follows: "Any voter or voters in the township, city, village or incorporated town containing such precinct may, between the hours of 9:00 a.m. and 5:00 p.m. of Monday

and Tuesday of the second week prior to the week in which *the 1970 primary election for the nomination of candidates for State and county offices or any election thereafter* is to be held, make application in writing, to the county clerk, to have any name upon the register of any precinct erased." (Italics added.) House Bill No. 473 made similar changes in section 4—13 of the Election Code, that is, whereas the county clerk was formerly required to hear applications for erasure during the second week prior to the week in which "any" election was to be held, now the language of section 4—13, as amended by House Bill No. 473 requires him to conduct such hearings during the second week prior to the week in which "the 1970 primary election for the nomination of candidates for State and county officers or any election thereafter is to be held." No provision expressly repealing the former statutes was included in the amendatory legislation, although that legislation did repeat the language of the prior statute with the changes and additions above noted. The respondent suggests that these changes in the wording of sections 4—12 and 4—13 eliminated the pre-election "application to erase" procedure as to the 1968 elections, and that he is under no duty to conduct hearings upon the filed applications.

There are a number of cases, such as *People ex rel. Martin* v. *Village of Oak Park,* 372 Ill. 488, where we stated at p. 490 : "A general rule of construction is that if an act or section of an act be amended, and the amendment does not entirely repeat the original act or section, such portions not repeated are repealed without any specific expression for that purpose. The omitted portion cannot be legislated into existence by judicial construction." See, also, *People* v. *Chatman,* 38 Ill.2d 265, 269; *Krimmel* v. *Eielson,* 406 Ill. 202, 205; *People ex rel. Hines* v. *Baltimore and Ohio Southwestern Railroad Co.,* 366 Ill. 318, 322; *Miner* v. *Stafford,* 326 Ill. 204, 208.

This general rule of construction cannot prevail, how-

ever, in cases where a contrary legislative intent is clearly evidenced, for "being merely a rule for determining the intent of the legislature, it is not absolute and must yield when the intent of the legislature is otherwise indicated to be to the contrary—that the provisions of the original act or section which were omitted are not repealed. Such an intent of the legislature may be indicated by a consideration of the amendatory act in its entirety, or by a consideration of the amendatory act and the unamended sections of the original act or code as a whole, or by contemporaneous legislation on the same subject *or by other circumstances surrounding the enactment of the amendment.*" (Emphasis added.) Sutherland, Statutory Construction, § 1932 (3d ed. 1943); *Roth* v. *Northern Assurance Co.,* 32 Ill.2d 40, 50; *Scribner* v. *Sachs,* 18 Ill.2d 400, 411; *People ex rel. Stahly* v. *Brady,* 273 Ill. 178, 183; accord, *Winter* v. *Hindin,* 33 Del. 294, 136 A. 280.

The primary purpose of statutory construction is ascertainment of the legislative purpose and intent. To that end, consideration of the history and course of the legislation is always proper. (*People* v. *Boreman,* 401 Ill. 566, 571; *Scofield* v. *Board of Education,* 411 Ill. 11, 16.) Also apropos is consideration of the occasion and necessity for the law, the previous condition of the law on the subject, and the defects, if any, in the former law which were intended to be remedied. (*Livingston* v. *Meyers,* 6 Ill.2d 325, 332; *Anderson* v. *City of Park Ridge,* 396 Ill. 235.) Furthermore, "It is a universally adopted rule of statutory construction that the intention of the legislature is to be gathered *not only from the language used* but also from the reasons for the enactment and the purposes to be thereby attained." (Italics suppplied.) *In re Estate of Curtis,* 28 Ill.2d 172, 179; *Mid-South Chemical Corp.* v. *Carpentier,* 14 Ill.2d 514, 517; *People ex rel. Roan* v. *Wilson,* 405 Ill. 122, 127.

A review of the legislative path leading to the adoption

of House Bill No. 473, clearly indicates the absence of any intent to eliminate the erasure procedure and that a literal reading of the present language of sections 4—12 and 4—13 does not correctly reflect the legislature's general over-riding intention to continue that procedure in force for the purpose of removing from the register of voters the names of unqualified persons. The importance of the continued viability of this remedy in 1968 is emphasized by the fact that this is a presidential election year. In the legislative circumstances present here an election safeguard existing for 25 years prior to 1968 and expressly continued in 1970 and thereafter can scarcely be thought repealed, in the absence of an express repealer, as to 1968. We have concluded that this supposed gap in the applicability of this procedure to the year 1968 was due solely to an oversight by the General Assembly caused by confusion engendered by certain amendments to House Bill No. 473. That Bill amended fourteen sections and added two new sections to article 4 of the Election Code. As originally introduced in the House of Representatives, House Bill No. 473 provided a comprehensive scheme for mandatory re-registration of voters in each precinct, which was to take place during 3 days of re-registration: January 12, 1968, March 1, 1968, and May 14, 1968. The newly proposed section 4—5.01 provided that, after re-registration, the registration records compiled before January 12, 1968, should be destroyed. Three amendments to House Bill No. 473 were offered in the House and adopted on second reading of the Bill. The effect of the House amendments was to give each county the option of adopting the re-registration procedure by resolution of the County Board. The House amendments to the original Bill also provided that the days on which re-registration was to be held would be November 17, 1967, December 15, 1967, and January 16, 1968, thereby pushing back the dates on which re-registration was to occur from the originally proposed January through May dates in 1968,

to the earlier November, 1967, through January, 1968, dates. No House action was taken however to limit the right, existing under the Bill as originally introduced, of voters to employ the erasure procedure of 4—12 and 4—13 for the 1968 primary election or any election thereafter.

When House Bill No. 473, as amended in the House, reached the Senate it was there amended to provide that the optional re-registration would occcur on November 21, 1968, December 19, 1969, and January 15, 1970, in those counties adopting resolutions. The Senate amendment to the Bill also provided that the voters should have the right to employ the erasure procedure of 4—12 and 4—13 for "the 1970 primary election for the nomination of candidates for State and county offices or any election thereafter". The House concurred in the Senate amendment and the Bill, as amended, was eventually enacted into law. It is thus apparent that the erasure provisions were retained in the original Bill and all amendments, and it seems quite clear that neither the House nor the Senate had any intent to eliminate this safeguard in the 1968 elections. The effect of this rather complicated course of legislative action was to leave the literal language of sections 4—12 and 4—13 as apparently repealing the erasure procedure for the presidential election of 1968 and reinstating it for the 1970 and subsequent elections. It is to us incredible that such a result was in fact intended by the General Assembly, and we find this particularly true in view of the availability of this procedure for some 25 years prior to 1968 and its express availability in the 1970 elections and thereafter. This is, in our judgment, clearly a legislative oversight resulting from the successive amendments to House Bill No. 473.

Ample precedent exists for the conclusions here reached. In *Village of Glencoe* v. *Hurford,* 317 Ill. 203, 220, we said: "When the literal enforcement of a statute would result in great injustice and lead to consequences which the legislature could not have contemplated, the courts are

bound to presume that such consequences were not intended and will adopt a construction which it may be reasonable to presume was contemplated by the legislature. *City of Chicago* v. *Mayer,* 290 Ill. 142." (See *People* v. *Continental Illinois Nat. Bank and Trust Co.,* 360 Ill. 454, 458.) In *People ex rel. Community High School District No. 231* v. *Hupe,* 2 Ill.2d 434, 448-9, we noted that where the passage of a series of legislative acts results in confusion and consequences which the legislature may not have contemplated, the courts must construe the acts to reflect the obvious intent of the legislature even if the words of a particular section must be read as modified or altered so as to comport with the legislative intent. A prime example of the application of such principles of statutory construction may be found in *People ex rel. Barrett* v. *Anderson,* 398 Ill. 480, where the legislature, in the Congressional Reapportionment Act of 1947 described certain territory as "the village of Stickney" instead of "the township of Stickney", thus creating a situation wherein a literal reading of the statutory language would have caused all of the township outside of the village to remain unapportioned. After finding a legislative intent to reapportion the entire territory of the State into 26 Congressional Districts, this court concluded that the word "township" should be read into the Act in lieu of the word "village". In *Anderson* we said, "while courts are and should be cautious about adding words, as such, to a statute generally, they will not hesitate to read into the sense of some section or provision a qualifying or expanding expression plainly implied by the general context of the act, which has been palpably omitted and which is necessary to prevent the legislative purpose from failing in one of its material aspects. (*Elizabeth Arden Sales Corp.* v. *Gus Blass Co.* 150 Fed. 2d 938.) We have held in *Burns* v. *Industrial Com.* 356 Ill. 602, 'The primary purpose of statutory construction is to arrive at the legislative intent. (*People* v. *Talbot,* 322 Ill. 416.) In

order to arrive at this intent the several provisions of the statute are to be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and plan thereof as therein expressed. (*Public Utilities Com.* v. *Monarch Co.* 267 Ill. 528.) If this intention can be collected from the statute, words may be modified, altered or supplied so as to obviate any repugnancy or inconsistency with such legislative intention. [Citations.]' And, also, we have held in *Smith* v. *County of Logan,* 284 Ill. 163, 'The object of construing a statute is to ascertain and give effect to the intention of the legislature. The intention of the law-makers is the law. It is to be gathered from the necessity or reason of the enactment and the meaning of the words, enlarged or restricted according to their real intent. In seeking this intention the court will always have regard to existing circumstances, contemporaneous conditions, the object sought to be attained by the statute and the necessity or want of necessity for its adoption. It must also have in mind the language used by the legislature, the evil to be remedied and the object to be attained. In construing a statute the court will not be confined to its literal meaning. A thing within the intention is regarded within the statute although not within the letter. A thing within the letter is not within the statute if it is not within the intention. When the intention has been thus ascertained from the reading of the statute, words may be modified or altered so as to obviate all inconsistencies with such intention.' " 398 Ill. at 485-6. See, also, *Klein* v. *Department of Registration and Education,* 412 Ill. 75, 06; *People ex rel. Simpson* v. *Funkhouser,* 385 Ill. 396, 403-4; *Burns* v. *Industrial Com.,* 356 Ill. 602, 606.

The problem here is also similar in several material respects to *Trustees of Schools* v. *Sons,* 27 Ill.2d 63, and *Scofield* v. *Board of Education,* 411 Ill. II. In *Sons* we were confronted with a construction problem caused by the

enactment of the School Code of 1961 which recodified articles 6 and 7 of the former School Code into a single article 10. A literal reading of section 16—6 of the 1961 Code would have restricted the power of eminent domain of boards of education in districts with a population of from 1,000 to 500,000 to that exercisable by boards of directors in districts with less than 1,000 population. We refused to adopt such a construction, holding that all of the available indications pointed to the conclusion that no change in substance was intended by the 1961 Code in a policy that had been in effect continuously for more than 50 years. We there said that the change in the language of the new section was merely an inadvertent result of the effort to compress and simplify the school law. Similarly, in *Scofield* v. *Board of Education,* 411 Ill. 11, a codification of laws relating to school elections had omitted from the qualifications of voters at school elections any requirement of citizenship or age, but after analyzing the legislative history of the act we concluded that the requirements of United States citizenship and attainment of age 21 were to be read into the School Code in order to avoid "grave, absurd and ridiculous consequences not contemplated or intended by the General Assembly." 411 Ill. at 21.

We also recently said in *Illinois Crime Investigating Com.* v. *Buccieri,* 36 Ill.2d 556, 561, that since it would be presumed that the legislature did not intend absurd, inconvenient or unjust consequences, we would hold that section 13 of the Crime Investigating Commission Act necessarily contemplated that orders to compel obedience to subpoenas issued by the commission could only be entered upon due notice and hearing, although the language of section 13 was actually silent as to a requirement for such notice and hearing.

We believe that the omission from the 1967 amendments to the Election Code of a provision expressly continuing the employment of the erasure procedure for the

316

1968 election was purely an oversight by the legislature, and in view of the long standing applicability of that challenge procedure as well as its intended re-employment in 1970 and thereafter, we hold that sections 4—12 and 4—13 as presently constituted must be read as requiring the clerk of St. Clair County to conduct hearings on the erasure applications duly filed by petitioners herein.

*Writ awarded.*