NO. 4-05-1034        Filed 10/27/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JACK E. DUSTHIMER, KATHY DUSTHIMER, and BRANDT DUSTHIMER, | ) ) | Appeal from Circuit Court of |
|     Plaintiffs-Appellants, | ) | Champaign County |
|     v. | ) | No. 04MR446 |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | ) ) ) | Honorable |
|     Defendant-Appellee. | ) ) | Charles McRae Leonhard, Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

The plaintiffs are Jack and Kathy Dusthimer and their son Brandt. The defendant is the Board of Trustees of the University of Illinois. Jack and Kathy are helping pay Brandt's tuition at the university. (For clarity and ease of reference, we will use first names when referring to the plaintiffs individually.) Tuition would be cheaper if Brandt were a resident of Illinois. The university, however, has refused to classify him as a resident. Plaintiffs challenged the university's decision by filing a complaint for administrative review, which, with leave of the circuit court, they repleaded as an amended complaint for a writ of certiorari. After oral arguments, the court entered judgment in the board's favor. Plaintiffs appeal, arguing the university is violating its own regulation defining who is a "resident."

We find no ambiguity in the regulation. In plain language, it defines a "resident" to include the dependent of someone employed at least a quarter of the time as a faculty member of a "state-supported institution[] of higher education in Illinois." University of Illinois

Residency-Status Regulations, par. K, at 3 (eff. Fall 1997). Given the undisputed facts in the record, we find that Brandt meets that definition: he is the dependent son of Kathy, who is on the faculty of Black Hawk College in Moline, an institution of higher education which the State supports financially. Therefore we reverse the circuit court's judgment and remand this case for issuance of the requested writ of <u>certiorari</u>.

## I. BACKGROUND

In their amended complaint, which they filed in June 2005, plaintiffs allege they are residents of Iowa and that Kathy is employed at least a quarter of the time as a faculty member of Black Hawk College, "a state-supported institution of higher education." Brandt is her and Jack's dependent son. He has just finished his sophomore year at the University of Illinois in Urbana-Champaign, and they are contributing toward his tuition. The university has a regulation on the residency status of its students. Paragraph K of the regulation provides as follows:

> "Staff members of the [u]niversity and of allied agencies,
> and faculties of state-supported institutions of higher education in
> Illinois, holding an appointment of at least one-quarter time, and
> their spouses and dependent children, shall be treated as residents."
> University of Illinois Residency-Status Regulations, par. K, at 3
> (eff. Fall 1997).

The university denied Brandt's application for residency status under paragraph K and denied his administrative appeal. As a result, plaintiffs must pay the higher nonresident tuition.

In its answer, the board denies that Black Hawk College is a "state-supported

- 2 -

institution of higher education" and, therefore, denies that Brandt is eligible for resident tuition under paragraph K of the regulation. The board filed a certified record of the administrative proceedings. In the remaining paragraphs of this "Background," we will summarize the material documentation from the administrative record.

On December 9, 2003, Darice Yonker of the Illinois Board of Higher Education sent Jack an e-mail quoting section 1(a) of the Board of Higher Education Act (110 ILCS 205/1(a) (West 2004)), which defined "'[p]ublic institutions of higher education'" to include "'the public community colleges of the State.'"

On December 10, 2003, Bruce Bennett, assistant director for system finances at the Illinois Community College Board, sent Jack an e-mail stating: "Black Hawk College is a state[-]funded public institution of [h]igher [e]ducation in the State of Illinois."

On December 16, 2003, Brandt signed a fill-in-the-blank application for residency status. In this form, he certifies he is the dependent child of Kathy, a faculty member of Black Hawk College, a state-supported institution of higher learning in Illinois. The third page of the form is a "Certificate of Appointment," signed by Gary A. Bibby, data and systems specialist of Black Hawk College, confirming that Kathy is on the faculty of the college.

A "2003 Benefit Summary Statement" shows that Kathy is a participant in the State Universities Retirement System.

The administrative record also includes a printout from a web page maintained by the marketing department of Black Hawk College showing that in 2003, the college received 35.4% of its revenue from State funds. Its annual budget was $30.6 million.

On January 7, 2004, Gayle Laman, assistant director of university-wide student

programs at the university, sent an e-mail to two other staff members of the university, Ira Langston and Marilyn Marshall. In this e-mail, she made the following inquiry:

"I have a question that exceeds my history over here. I have a request from a father to grant resident tuition to his son based on the fact that the mother/wife is an employee of Black Hawk Community College in Moline. The family lives in Iowa. I know that the practice has been to limit resident tuition based on parental employment to four-year institutions--not community colleges. I believe we used the rationale that this was the same group of institutions covered in the [child-of-employee tuition waiver] (half-price tuition). And I think we also used the rationale that [a four-year] institution received state funding while community[-] college funding was regional.

The father has sent me documentation that the state support of Black Hawk [College] is 35%--larger than our state[-]support percentage. And he has sent me a definition of 'public institutions of higher education' from the Illinois code that includes four-year[] and community colleges. I called Lisa Huson[,] who is doing some checking[,] but it looks [as if] we need to change our definition. Do either of you have any history to shed on this?

Is there anything in writing on this topic that you recall?"

On January 8, 2004, Marshall, of the university's office for planning and budget-

ing, replied to Layman with the following e-mail:

> "'State supported' was a key phrase Peter used when he and I coordinated the major revision of residency in the late [1980s] (?). I think we moved from [']state[-]assisted['] to [']state[-]supported['] in order <u>not</u> to capture the community colleges and private[] [institutions] that get state money. *** [C]ommunity colleges are considered []local units of government[] ***. ***
>
> Because community colleges do not receive most of their funding from the state, I don't think it was meant that their employees are to be treated as residents. The problem is that state support for public universities has fallen so much that I wonder [whether the *** employees [of the University of Illinois] would qualify; I don't know what the percentage is now.
>
> * * *
>
> I would suggest trying to get the definition of 'state[-]supported.' It is around somewhere. I don't think it was a random phrase that was put together for the residency policy. Nonetheless, just because someone says a third of the funding (an unknown numerator over an unknown denominator) for Black Hawk [College] is state support, that doesn't make them 'state supported.' Their basis of funding is local, not state." (Emphasis in original.)

In a letter dated March 18, 2004, Layman informed Jack that after "reviewing the policies and state law," the university concluded that Brandt was not a "resident" of Illinois within the meaning of paragraph K of the regulation and, therefore, he did not qualify for in-state tuition. According to her, "state-supported institutions of higher education" meant only state universities. She reasoned as follows:

"[T]o compare the levels of funding between a community college and a campus of the University of Illinois, one should only compare the funding for instruction costs[,] since a community college's primary mission is instruction and it engages in compara-tively little research, public service[,] or outreach. The instruction costs at our Urbana campus are entirely supported by state funds (50%) and tuition (50%). So, for comparison purposes, the state support for the instruction at [the university] is 50%.

There is no definition in state statutes for the term 'state-supported[,]' as used in the [regulations,] and the [regulations] themselves provide no definition. Therefore, we must look to other statutory language and to the commonly understood use of the term 'state-supported' institution.

Black Hawk [College] is a community college which is created generally under [the Public Community College Act (110 ILCS 805/1-1 through 8-2 (West 2004))]. There are a number of important differences between community colleges and State

universities.  State universities, such as the University of Illinois, are individually established by the Illinois legislature and draw their funding primarily from State appropriations.  Community colleges are not individually created by the Illinois legislature, [but,] rather[,] are created by petition and referendum[] and are primarily funded through local[-]district tax funds.  Consequently, community colleges are sustained on a local and not statewide basis, although they may get some state money in the form of grants.

In fact, community[-]college boards are authorized to actually levy taxes for educational purposes and for the operation and maintenance of facilities.  State institutions have no such authority and are dependent on the State legislature for their appropriations.  Community[-]college boards set their own fiscal year and budget[] [and] select their own basis of financing and their own systems of accounting.  [Citation.]

Other statutes contemplate what tuition benefits employees of state-supported institutions receive.  [Section 7f of the University of Illinois Act (110 ILCS 305/7f(b) (West 2004))] provides for a 50% tuition waiver to the children of employees of 'an Illinois college or university who have been employed by any one or by more than one Illinois college or university for an aggregate period

of at least [seven] years.' Subsection (a) of section 7f defines 'Illinois college or university' as 'the University of Illinois, Southern Illinois University, Chicago State University, Eastern Illinois University, Northeastern Illinois University, Northern Illinois University, and Western Illinois University.' [110 ILCS 305/7f(a) (West 2004).]

In conclusion, although it's true that Black Hawk [College] does receive some State money, it is not a 'state-supported' institution as contemplated in the [regulations]."

Plaintiffs appealed to the director of admissions and the director of the office for academic policy analysis. They pointed out that while the University of Illinois received 31% of its total revenue from the State, Black Hawk College received 34% of its revenue from the State--showing that Black Hawk College was, in fact, more "state-supported" than the university. They argued that just because Black Hawk College received revenue from other sources, such as the local community, that fact did not negate its status as a state-supported institution, any more than the university's receipt of $500 million in federal funds negated its status as a state-supported institution. These arguments failed to carry the day, either in the university or circuit court.

II. ANALYSIS

A. Standard of Review

Section 3-102 of the Administrative Review Law (735 ILCS 5/3-102 (West 2004)) empowers a court to review the final decision of an administrative agency if the statute "creating or conferring power on such agency, by express reference, adopts the provisions of

- 8 -

[a]rticle III of [the Code of Civil Procedure, i.e., the Administrative Review Law (735 ILCS 5/3-101 through 3-113 (West 2004)),] or its predecessor, the Administrative Review Act." Otherwise--unless the statute creating or empowering the agency prescribes some other form of review--the plaintiff must seek a writ of certiorari under the common law. Applegate v. Department of Transportation, 335 Ill. App. 3d 1056, 1061, 783 N.E.2d 96, 102 (2002), appeal denied, 204 Ill. 2d 656, 792 N.E.2d 305 (2003). The University of Illinois Act (110 ILCS 305/0.01 through 30 (West 2004)), which, in section 1 (110 ILCS 305/1 (West 2004)), creates the board of trustees, nowhere adopts the Administrative Review Law or prescribes any other form of review. In denying Brandt's application for classification as a resident, the university exercised quasijudicial power, adjudicating facts and individual rights. See Applegate, 335 Ill. App. 3d at 1061, 783 N.E.2d at 102. Therefore, the university's decision is reviewable in an action for a writ of certiorari.

Our standard of review is the same as in actions under the Administrative Review Law. Applegate, 335 Ill. App. 3d at 1061, 783 N.E.2d at 102. Given the certified record of the administrative agency, we ask whether the factual findings and conclusions of the agency are against the manifest weight of the evidence. O'Boyle v. Personnel Board of Chicago, 119 Ill. App. 3d 648, 653, 456 N.E.2d 998, 1002 (1983).

In the present case, the material facts are undisputed, and we have no occasion to ask whether the factual findings of the university are against the manifest weight of the evidence. Only the meaning of the regulation is in dispute. The board argues "it is of tantamount impor- tance that deference be given an administrative agency's own interpretation of the regulations which it has set forth." Rend Lake College Federation of Teachers, Local 3708 v. Board of

- 9 -

Community College, District No. 521, 84 Ill. App. 3d 308, 311, 405 N.E.2d 364, 368 (1980).  In its explication of our standard of review, however, the board overlooks the indispensable precondition of deference:  ambiguity.  We will defer to an agency's interpretation of its regulation only if the regulation is ambiguous (Hetzer v. State Police Merit Board, 49 Ill. App. 3d 1045, 1047-48, 365 N.E.2d 261, 263-64 (1977))--that is, only if reasonably well-informed persons could understand the regulation in more than one sense (Illinois Bell Telephone Co. v. Illinois Commerce Comm'n, 362 Ill. App. 3d 652, 657, 840 N.E.2d 704, 709 (2005)).  The board is correct that a reviewing court should overturn an agency's interpretation of its own regulation only if the interpretation is "'clearly erroneous.'"  Cotter & Co. v. Property Tax Appeal Board, 277 Ill. App. 3d 538, 542-43, 660 N.E.2d 1283, 1285 (1995), quoting LaBelle v. State Employees Retirement System, 265 Ill. App. 3d 733, 735-36, 638 N.E.2d 412, 415 (1994).  But "plainly erroneous" means "contrary to the clear language of the provision."  Ress v. Office of the State Comptroller, 329 Ill. App. 3d 136, 142, 768 N.E.2d 255, 260 (2002).  When we defer to an agency's interpretation, our justification for doing so is the agency's experience and expertise (LaBelle, 265 Ill. App. 3d at 735, 638 N.E.2d at 415), but all the experience and expertise in the world cannot change what a regulation plainly says.  If the regulation is unambiguous, "that is the end of the matter" (Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 81 L. Ed. 2d 694, 703, 104 S. Ct. 2778, 2781 (1984)), and deference goes out the window.  "'"[O]nly as the interpreter of a doubtful law"'" does an agency deserve deference. Hetzer, 49 Ill. App. 3d at 1047, 365 N.E.2d at 263, quoting Whittemore v. People, 227 Ill. 453, 471, 81 N.E.2d 427, 433 (1907), quoting 2 Lewis' Sutherland on Statutory Construction §473 (2d. 1904)).

B. "State-Supported Institutions of Higher Education"

Under section 1 of the University of Illinois Act, the board of trustees has statutory power to "make and establish [bylaws] *** for the management or government, in all its various departments and relations, of the University of Illinois." 110 ILCS 305/1 (West 2004). Obviously, to "manage[] or govern[]" the university "in all its various *** relations," the board must make a huge variety of decisions, including who will qualify as a "resident" of Illinois for purposes of assessing tuition. When the board makes a regulation on that question, the regulation has the same force as section 1 of the University of Illinois Act. See Rend Lake, 84 Ill. App. 3d at 310, 405 N.E.2d at 367. The briefs do not specifically discuss the enactment of the residency-status regulation, nor does the record appear to do so. But the regulation provides that it is amendable at the board's discretion, which seems to suggest that the board is the entity that promulgated the regulation in the first place. Because no one is above the law, including those who make law, the regulation binds the board. See Rend Lake, 84 Ill. App. 3d at 311, 405 N.E.2d at 367; Pace Realty Group, Inc. v. Property Tax Appeal Board, 306 Ill. App. 3d 718, 729-30, 713 N.E.2d 1249, 1257-58 (1999).

We interpret administrative regulations the same way we interpret statutes. Hetzer, 49 Ill. App. 3d at 1047, 365 N.E.2d at 263; Mora v. Industrial Comm'n, 312 Ill. App. 3d 266, 271, 726 N.E.2d 650, 653 (2000). Absent a special definition, we give the words of the text their ordinary meaning. Gerwin v. Livingston County Board, 345 Ill. App. 3d 352, 361, 802 N.E.2d 410, 417 (2003); Wahlman v. C. Becker Milling Co., 279 Ill. 612, 622, 117 N.E. 140, 144 (1917). If the meaning of a statute is evident from its plain language, we will decline any invitation to consider legislative history or other external aids of construction. Allstate Insurance

Co. v. Menards, Inc., 202 Ill. 2d 586, 594, 782 N.E.2d 258, 263 (2002); Petersen v. Wallach, 198 Ill. 2d 439, 446, 764 N.E.2d 19, 23 (2002) ("because the language of [the statute] is unambiguous, it was improvident for the appellate court to look beyond the language of the statute to the legislative history").  Thus, if a regulation conveys its meaning in plain, unambiguous language, we will refrain from seeking the meaning outside the text.  Only ambiguity expands the boundaries of the text.

Again, the regulation at issue in this case reads as follows:

"Staff members of the [u]niversity and of allied agencies, and faculties of state-supported institutions of higher education in Illinois, holding an appointment of at least one-quarter time, and their spouses and dependent children, shall be treated as residents."  University of Illinois Residency-Status Regulations, par. K, at 3 (eff. Fall 1997).

As we explained, we have no occasion for deference unless those words, quoted above, are ambiguous--unless reasonably well-informed persons could understand them in more than one sense.  "Higher education" is "education beyond the secondary level," especially "education provided by a college or university."  Merriam-Webster's Collegiate Dictionary 546 (10th ed. 2000).  Thus, a college is an "institution[] of higher education."  To "support" an institution means to "assist" or "help" the institution or "pay [its] costs."  Merriam-Webster's Collegiate Dictionary 1180 (10th ed. 2000).  When one says, for example, "I support United Way," one normally is understood to mean that one helps United Way, probably in a financial sense--not necessarily by paying all or even most of United Way's expenses, but by making a contribution.

New Oxford American Dictionary 1708 (2001) (defining "support" as "give assistance to, esp[ecially] financially").  Linguistically, the regulation in this case is clear and easy to understand--it is plain, unadorned English.  A "state-supported institution[] of higher education in Illinois" means, quite simply, a college or university in Illinois that receives financial assistance from the State.  One could not interpret the regulation any other way without reading into it a special definition that does not appear in the text.

Because the residency-status regulation is unambiguous, we owe the board's interpretation no deference.  Nevertheless, we will consider the reasons the board advances for its own interpretation and its objections against plaintiffs' interpretation.

1. The Real Meaning Is To Be Found in Legislative History

In its brief, the board states:  "The record reveals that when the residency regulations were revised in the late 1980s, the [b]oard of [t]rustees changed the wording of the regulation at issue from 'state-assisted' to 'state-supported' in order not to capture the [S]tate's community colleges and private institutions that receive state funding."  (Emphasis in original.) The board is inviting us to consider an external aid of construction--legislative history--when the meaning of paragraph K of the regulation is clear on its face.  We decline to do so.  See Allstate Insurance Co., 202 Ill. 2d at 594, 782 N.E.2d at 263; Petersen, 198 Ill. 2d at 446, 764 N.E.2d at 23.  When reading the residency-status regulation, parents and students should not have to ransack previous versions of the regulation in an effort to divine whether the board has some covert intention at odds with what the regulation plainly says.

Even if we considered this legislative history, the distinction between a "state-assisted" and "state-supported" institution could strike one as exceedingly subtle, like the

- 13 -

distinction between feathers and plumage. See Merriam-Webster's Collegiate Dictionary 1180 (10th ed. 2000) ("assist" is a synonym of "support"). In her e-mail of January 8, 2004, Marshall puts her own gloss on this change in terminology, but presumably the board of trustees was the promulgator of the regulation, and the record contains no evidence that either Marshall or "Peter" was on the board in the 1980s.

## 2. Blame the State's Budgetary Decisions

The board insists it has had a "long[-]standing conceptual distinction between the [S]tate's four-year public universities, the [S]tate's community colleges, and the [S]tate's private institutions," which one could formerly categorize as "state-supported," "locally supported," and "privately supported," respectively. The board argues that just because the General Assembly, in its budgetary decisions, "has muddled the conceptual distinction between" these three types of institutions, we should keep the distinction intact by holding that only four-year state universities are "state-supported."

The problem with this argument is that by using the term "state-supported" in its regulation, the board deliberately put the State's budgetary decisions--which everyone knows vary from year to year--front and center in the determination of who is a resident. Nowadays, a community college can be both state-supported and locally supported--as well as privately supported, if it maintains a foundation for which contributions are solicited for further support. If, in paragraph K, the board intended to classify, as residents, only the dependents of faculty members of four-year state universities in Illinois, the board could have easily said "four-year state universities in Illinois." Or the board could have easily listed the intended universities, as the General Assembly did in section 7f(a) of the University of Illinois Act (110 ILCS 305/7f(a)

- 14 -

(West 2004)), the statute Layman quoted to Jack in her rejection letter. Layman's initial assessment was right on target: to exclude state-supported institutions such as Black Hawk College, the board will have to "change [the] definition." If changing realities make a regulation no longer desirable as written, one should change the regulation rather than try to rehabilitate it with a strained interpretation. See University of Illinois Residency-Status Regulations at 1 (eff. Fall 1997) ("Residency[-]Status Regulations are subject to change from time to time at the discretion of the [b]oard of [t]rustees").

### 3. Plaintiffs' Interpretation Is Not Exact Enough

According to the board, plaintiffs' interpretation of paragraph K is untenable because it raises such questions as "what 'financial support' means," "how 'financial support' is measured," and "what level of 'financial support' is sufficient to qualify as 'state-supported.'" The board seems to suggest that one should not understand "state-supported" to mean "supported financially by the State" unless the application and effect of the regulation, so interpreted, would be clear in every circumstance that could potentially arise. This standard would be unreasonable. In 2003, the State gave Black Hawk College a total of $10,832,400 (35.4% of the college's total revenue of $30.6 million). No one could seriously deny that the State thereby supported Black Hawk College in 2003.

### 4. Plaintiffs' Interpretation Is Too Generous

The board complains that "under [p]laintiffs' interpretation of the term 'state-supported,' many, if not all, Illinois private institutions of higher education could arguably be classified as 'state-supported,'" because many, if not all, such institutions receive state funds. Effectively, the term "state-supported" would be superfluous, in the board's view. In the fiscal

year 2000, 68 nonpublic institutions of higher education in Illinois received a total of $20,649,600 in state grants. Illinois Board of Higher Education, Illinois Financial Assistance Act: Fiscal Year 2000 Grant Allocation, available at http://www.ibhe.state.il.us/Board/agendas/2000/February/2000-02-CA05.pdf.

A latent ambiguity arises if the words of the legislation are clear in themselves but, because of external circumstances (in this case, the liberality of state grant programs), the literal application of those words would create an absurdity that the legislative body could not possibly have intended. Gibson v. Country Mutual Insurance Co., 193 Ill. App. 3d 87, 90, 549 N.E.2d 23, 25 (1990). To maintain the separation of the legislative and judicial branches and avoid compromising our fidelity to the text, we should be extremely reluctant to second-guess the clear language of legislation in the name of preventing a latent ambiguity. In re Estate of Snodgrass, 336 Ill. App. 3d 619, 623, 784 N.E.2d 431, 435 (2003). Whenever a court disregards the clear language of legislation in the name of "avoiding absurdity," it runs the risk of implementing its own notions of optimal public policy and effectively becoming a legislature. Interpreting legislation to mean something other than what it clearly says is a measure of last resort, to avoid "great injustice" or an outcome that could be characterized, without exaggeration, as an absurdity and an utter frustration of the apparent purpose of the legislation. In re Detention of Lieberman, 201 Ill. 2d 300, 319-20, 776 N.E.2d 218, 229-30 (2002), quoting People ex rel. Cason v. Ring, 41 Ill. 2d 305, 312-13, 242 N.E.2d 267, 271 (1968), quoting Village of Glencoe v. Hurford, 317 Ill. 203, 220, 148 N.E. 69, 76 (1925).

In the present case, we are not even close to arriving at that impasse. Surely a college or university has to undergo some sort of vetting process before the State gives it

- 16 -

thousands or millions of dollars in public funds. When the board of trustees of the University of Illinois promulgated the residency-status regulation, it could have decided that if the government of the State of Illinois deemed an institution of higher education to be worthy of financial support, that was good enough for the University of Illinois--as an arm of the State, the University of Illinois would likewise extend its support by classifying the dependents of a faculty member of that institution as a resident. We find no latent ambiguity.

5. Residency Status Would Depend on the Changing State Budget

The board argues:

"[U]nder [p]laintiffs' interpretation of the term 'state-supported,' whether an institution is classified as 'state-supported' depends on whether the General Assembly appropriates funding and whether that funding is allocated to the institution. Consequently, an institution's status might change year to year depending upon the budgetary decisions of the General Assembly and the decisions of those charged with allocating the grants."

We do not find this objection to be very compelling. Under the board's own interpretation of the regulation, a student's residency status could change from year to year--or even from semester to semester--depending on whether the parent is still employed a quarter of the time on the faculty of the qualifying institution.

Moreover, this argument seems to undercut the board's argument that the term "state-supported" is superfluous as plaintiffs interpret it. If, "depending upon the budgetary decisions of the General Assembly and the decisions of those charged with allocating the grants,"

an institution of higher education could be "state-supported" one year but not the next year, the term would seem to have descriptive significance.

## III. CONCLUSION

For the foregoing reasons, we reverse the circuit court's judgment and remand this case with instructions to issue the requested writ of <u>certiorari</u>.

Reversed and remanded with directions.

TURNER, P.J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent.

The majority pronounces that the words "state-supported institution" are not ambiguous, and accordingly, it is not necessary to attempt to construe, interpret, or understand those words. I disagree. We interpret administrative regulations the same way we interpret statutes. Even if a statute is not particularly ambiguous, we should still examine it carefully and try to understand it, considering the entire statute in the factual context to which it applies and the various meanings that words may have. We should not seize upon one word or phrase in isolation and use that word as an excuse not to give the matter further consideration. Peck v. Froehlich, No. 4-05-0996, slip op. at 8 (August 9, 2006) ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___.

What does "state-supported" mean? Does it mean "state" as opposed to "private"? Does it mean "state" as opposed to "local"? Does it refer to an institution that receives most of its support from the state? A substantial amount of its support? Any amount of support? A statute is ambiguous when it is capable of being understood "by reasonably well-informed persons" in two or more different senses. In re B.L.S., 202 Ill. 2d 510, 517, 782 N.E.2d 217, 222 (2002); In re Timothy T., 343 Ill. App. 3d 1260, 1263, 799 N.E.2d 994, 997 (2003). The words "state-supported institution" are ambiguous here.

Statutory construction's fundamental rule requires courts to ascertain and give

- 19 -

effect to the legislature's intent. Thus, courts must consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it. People v. King, 366 Ill. App. 3d 552, 555, 852 N.E.2d 559, 561 (2006). The words used are only a way to get to the legislature's intent. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425, 62 L. Ed. 372, 376, 38 S. Ct. 158, 159 (1918) (opinion by Justice Holmes). Our goal is to give effect to the intent of the legislature, even if the language is not clear. It is not our goal to punish the legislature because its language is "exceedingly subtle" or could have been better written. See slip op. at 13-14. Under the majority's approach, if an absurd result is possible, we should go for it, to encourage the legislature to change the statute.

When the language of the statute is open to two possible interpretations, the interpretation that is reasonable and that will not produce "absurd, unjust, unreasonable[,] or inconvenient results" should prevail. Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund, 155 Ill. 2d 103, 110, 610 N.E.2d 1250, 1253 (1993); Albee v. City of Bloomington, 365 Ill. App. 3d 526, 528, 849 N.E.2d 1094, 1096 (2006). The majority's interpretation will produce an absurd result. The regulation was intended to distinguish between institutions that qualified and those that did not. Under the majority's interpretation, all institutions will qualify, even private religious institutions who receive some minimal form of state support. The majority's citation to Lieberman is inappropriate. Lieberman did not involve a statute that was open to two possible interpretations, but a situation where the court chose to honor the legislative intent despite the language of the statute. "We conclude that the legisla-

- 20 -

ture's omission of the now-repealed offense of rape from this definition was purely inadvertent and constituted a situation 'where a legislative intention, otherwise clear, was in part mistakenly or inaccurately stated.'" Lieberman, 201 Ill. 2d at 320, 776 N.E.2d at 229-30, quoting Gill v. Miller, 94 Ill. 2d 52, 58, 445 N.E.2d 330, 333-34 (1983).

The majority argues that we should not consider the fact that the regulation was revised in the late 1980s to change the wording from "state-assisted" to "state-supported." The majority complains that the board is inviting us to consider an external aid of construction-- legislative history--when the meaning is clear on its face. Slip op. at 13. This is not a situation where we are asked to consider something like the comments of a legislator on the floor, which may not have represented the thinking of other legislators who voted for the bill. This is the language of the regulation itself. An amendment indicates that the amendment was enacted to clarify the legislature's original intent. Collins, 155 Ill. 2d at 111, 610 N.E.2d at 1253. It is clear from the face of the amendment here that a minimal amount, mere "assistance," does not constitute "support."

The majority says that we should not use external aids of construction but then refers to the dictionary. Why should we look to the dictionary, the meaning used by the public at large, but ignore the meaning actually used by "reasonably well-informed persons" in the profession? Even the dictionary refutes the majority's assertion that one could not interpret the regulation any other way than it has chosen to read it. There are other meanings to the word "support" than "assist" or "help." "Support" can also mean "to pay the costs of: MAINTAIN" and "to provide a basis for the existence or subsistence of." Merriam-Webster's Collegiate Dictionary 1184 (10th ed. 1998). Mere assistance does not amount to maintenance of or providing a basis

for the existence of an activity.

More important, there is a distinction between state-supported and local-supported institutions. The board's interpretation of the regulation is a reasonable one. Black Hawk College, a community college, is primarily funded through local tax funds. State institutions have no such source of funds and are primarily funded from State appropriations. The regulation has consistently been interpreted not to apply to community colleges; our decision is the first to do otherwise. Black Hawk College is not a "state-supported institution" as that term is used in the regulation. We should affirm the decision of the board and the decision of the circuit court.